Michael EMACK, Appellant,

v.

The STATE of Texas, Appellee.

No. 03–10–00253–CR.

Court of Appeals of Texas,
Austin.

Aug. 26, 2011.

Rehearing Overruled Dec. 13, 2011.

Gerald Harris Goldstein, Goldstein, Goldstein & Hilley, San Antonio, TX, Robert N. Udashen, Sorrells, Udashen & Anton, Dallas, TX, for Appellant.

Joseph Peter Corcoran, Assistant Attorney General, Postconviction Litigation Division, Austin, TX, for State.

Before Chief Justice JONES, Justices HENSON and GOODWIN.

## OPINION

J. WOODFIN JONES, Chief Justice.

Appellant Michael Emack pleaded no contest to an indictment accusing him of sexually assaulting a child. *See* Tex. Penal Code Ann. § 22.011(a)(2)(A) (West 2011). The district court adjudged him guilty and assessed punishment at seven years' imprisonment, as called for in a plea bargain agreement. Appellant brings forward twenty-one points urging that the trial court erred by overruling his pretrial motion to suppress evidence. We affirm the conviction.

## BACKGROUND

The YFZ (Yearning for Zion) Ranch is a 1691–acre property near Eldorado in Schleicher County. Over two hundred persons lived on the ranch in 2008, all of them members of the Fundamentalist Church of Jesus Christ of Latter Day Saints (FLDS). Among the structures on the property were a temple and a temple annex, nineteen residential buildings, a school, a clinic, a warehouse, a water treatment plant, and several commercial buildings. County tax records reflected that the land and improvements were owned by a single entity, YFZ Land, LLC. The ranch property was not subdivided, and there was no evidence that any of the buildings were owned or leased by an individual. The ranch was fenced, and access to the property was controlled by a locked gate, a manned guard house, and observation points.

On March 29 and 30, 2008, six telephone calls were received by the New Bridge Family Shelter Crisis Hotline in San Angelo from a person who identified herself as Sarah Jessop Barlow. She told the shelter workers that she was sixteen years old, pregnant, and the mother of an eight-month-old infant daughter. She said that she lived at the YFZ Ranch and was the

fourth wife of Dale Barlow, who she said was sexually and physically abusive to her. She said that she wanted to leave the ranch, but she was afraid of the punishment she would receive if she were caught trying to escape.

The trial court found, and appellant does not dispute, that the hotline employees who took the March 29 and 30 telephone calls believed that they were genuine. In truth, however, the calls were a hoax. There was no sixteen-year-old mother named Sarah Jessop Barlow. Instead, the calls were made by a woman named Rozita Swinton, a resident of Colorado, who apparently made the calls from that state. The hoax was discovered on April 13, 2008, after the searches in question had been conducted.

The calls to the shelter hotline were reported to the department of family and protective services (DFPS) office in San Angelo and to Schleicher County Sheriff David Doran. In turn, Doran reported the calls to Texas Ranger Brooks Long. On April 1, Long received the call notes from the shelter. He also received documents showing that in August 2007, a Dale Barlow had been placed on probation for three years following a conviction in Arizona for conspiring to commit sexual assault of a minor. On April 2, Long interviewed the shelter workers who had taken the calls, and on April 3, he received their signed affidavits describing the contents of the calls.

Long applied for a search and arrest warrant later that day. In summary, Long's probable cause affidavit stated:

- Long had been on the premises of the YFZ Ranch on several occasions and had observed the fences, guard house, and other security measures limiting access to the ranch. Long had spoken to Frederick Merril Jessop, who identified himself as the "authority" at the ranch

and the "point of contact" for law enforcement and other government officials who wanted access to the ranch. Jessop had told Long that approximately one hundred persons lived on the ranch.

- On April 2, 2008, Long interviewed Alisa Thomas and Jessica Carroll, employees of the New Bridge Family Shelter in San Angelo. As part of their duties at the shelter, Thomas and Carroll answered telephone calls to the "crisis hotline" available for those persons in need of the shelter's assistance.

- Thomas told Long that on March 29, 2008, she had a forty-two minute conversation on the crisis hotline with a female caller who identified herself as Sarah. Sarah told Thomas that she was born on January 13, 1992, had an eight-month-old child, and was pregnant. She said that she and her child lived with her husband, the father of her child, on a ranch in Eldorado. Sarah told Thomas that her husband hits her and that she would get in trouble if anyone learned that she had called.

- Carroll told Long that on March 29 and 30, 2008, she had multiple telephone conversations on the crisis hotline with a caller who identified herself as Sarah Barlow, maiden name Sarah Jessop. Sarah told Carroll that she was sixteen years old, pregnant, and the mother of an eight-month-old child. She identified her husband and the father of her child as Dale Barlow, age forty-nine. She said that she lived with Barlow at the YFZ Ranch. She said that Barlow was physically and sexually abusive to her. Sarah said that she wanted to escape from the ranch with her child but was afraid to try because of the guard house at the gate. She said that if she was caught trying to leave the ranch she would be locked in her room and denied

food. Sarah also described her fear of the outside world, saying that she had been told that outsiders would hurt her. During one of the calls on March 29, Sarah told Carroll that she wanted Carroll to forget she had called.

● Given Sarah's age and the age of her child, Long believed that Dale Barlow had penetrated Sarah's sexual organ with his sexual organ when Sarah was fifteen years old. Long said he "knows of no provision under Texas law for lawful marriage at the age of fifteen."

● Long confirmed through the sheriff that a Dale Barlow, born November 5, 1957, had been arrested in Arizona in July 2005 for conspiracy to commit sexual conduct with a minor. In August 2007, Barlow had been placed on three years' probation for this offense.

● Long believed that Sarah Jessop, her child, and Dale Barlow were currently located at the YFZ Ranch. Long also believed that medical records and other information relevant to the age and true identity of Sarah Jessop, the birth of her child, and her marriage to Dale Barlow could be found at the ranch.

At 5:50 p.m. on April 3, 2008, the judge of the 51st District Court, sitting as a magistrate, signed a warrant to search the YFZ Ranch for records relating to the age and identity of Sarah Jessop, any pregnancy or child of Sarah Jessop, any marriage of Sarah Jessop to any party including Dale Barlow, and any marriage of Dale Barlow to any party including Sarah Jessop. The warrant also ordered Barlow's arrest.

Also on April 3, the DFPS filed a petition in the 51st District Court for an order in aid of investigation of a report of child abuse. *See* Tex. Fam.Code Ann. § 261.303 (West 2008). Attached to the petition was the affidavit of Ruby Gutierrez, a depart-

ment caseworker, describing the calls to the hotline and Dale Barlow's Arizona conviction. A few minutes after signing the first warrant, the judge signed an order giving the department investigatory access to Sarah Jessop Barlow and her infant daughter at the YFZ Ranch.

Later that evening, Texas Rangers and other police officers acting under the search warrant and DFPS caseworkers acting under the order for investigation entered the YFZ Ranch. The caseworkers immediately began a process of interviewing every female on the ranch between the ages of seven and seventeen. During these interviews, several of the girls reported being married to, and mothers of, children with, adult men who lived at the ranch. Some of them also stated that the men to whom they were married had other wives. On the morning of April 4, the police began a structure-by-structure search of the ranch pursuant to the first warrant. They did not find Sarah Jessop Barlow and her infant daughter, nor did they find Dale Barlow.[1] They did, however, observe evidence—several beds in the temple and marriage records—tending to confirm the girls' descriptions of underage sexual activity and bigamy.

On April 6, 2008, Long applied to the judge of the 51st District Court for a second search warrant. The complete probable cause portion of Long's April 6 affidavit is attached as an appendix to this opinion. In summary, the affidavit stated:

● Long had been on the premises of the YFZ Ranch on several occasions, most recently on April 4, 5, and 6, 2008, and had observed the fences, guard house, and other security measures limiting access to the ranch. Long had spoken to Frederick Merril Jessop, who identified himself as the "authority" at the ranch

---

1. The evidence shows that Barlow was living in Arizona at the time.

and the "point of contact" for law enforcement and other government officials who wanted access to the ranch. Jessop had told Long on April 4 that approximately two hundred fifty persons lived on the ranch.

• On April 5, 2008, while conducting a search of the ranch pursuant to the first warrant, Long saw computers, vaults, and locked drawers inside the temple and temple annex. He also saw several beds in the temple, in one of which the linens were disturbed and there was a strand of what Long believed, due to its length, was female hair. He also saw a document indicating marriages between one man and over twenty wives.

• On April 6, 2008, Long spoke to three DFPS employees, Tina Martinez, Ruby Gutierrez, and Rebecca Baxter. Between April 4 and 6, Martinez, Gutierrez, and Baxter had interviewed eight juvenile females living at the YFZ Ranch. During these interviews, the girls stated that they were in plural marriages with men at the ranch or knew others girls who were. They also stated that they or girls they knew at the ranch had given birth at age sixteen or younger.

• On April 6, 2008, Sheriff Doran told Long that all the residents of the YFZ Ranch are members of the FLDS. Doran also told Long that on April 5, 2008, Doran spoke to a confidential informer who was a former FLDS member and who had given Doran accurate information about the FLDS on more than twenty prior occasions. The informer told Doran that adult male FLDS members practice polygamy, that their brides are often under the age of sixteen, and that there was a bed in the temple in which the men engage in sexual activity with the underage brides.

The judge signed the second warrant at 10:15 p.m. on April 6. The warrant ordered a search of the YFZ Ranch for evidence of marriages between females under the age of seventeen and adult males, and of pregnancies and births by females under the age of seventeen. The warrant was executed immediately.

Appellant and nine other individuals living at the YFZ Ranch were subsequently indicted for sexual assault of a child and bigamy. With the district court's permission, the ten defendants filed a joint motion to suppress evidence. Following a four-day hearing at which all the defendants were represented by counsel, the motion was overruled. Appellant subsequently entered his plea to the sexual assault indictment and was convicted. This appeal followed.[2]

## ISSUES PRESENTED

Appellant contends that the search of the YFZ Ranch pursuant to the April 6 warrant violated his rights under the First and Fourth Amendments, article I, section 9, and article 38.23. *See* U.S. Const. amends. I, IV; Tex. Const. art. I, § 9; Tex.Code Crim. Proc. Ann. art. 38.23 (West 2005). He urges that the evidence seized during this search, which "revealed the identity of Appellant Emack and the evidence offered against him in the court below," should have been suppressed. Appellant also contends that his constitutional and statutory rights were violated by the initial search of the ranch pursuant to the April 3 warrant and the interviews conducted by DFPS caseworkers pursuant to the order in aid of investigation. He ar-

---

2. Appellant also pleaded no contest to a bigamy indictment. His appeal from that conviction is pending in this Court, as are appeals by other individuals who joined the motion to suppress and were later convicted.

gues that the information obtained during the April 3 search and interviews was improperly used as "the basis for [the] second [April 6] search warrant which resulted in the seizure of the evidence used against Appellant Emack." Appellant's reply brief adds, "What Emack has sought to suppress is the documentary evidence seized as a result of the execution of the second search warrant. . . ."

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. *State v. Dixon,* 206 S.W.3d 587, 590 (Tex.Crim.App.2006). This means that the ruling will be upheld if it is reasonably supported by the record and is correct under any applicable legal theory. *Id.* The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim.App.2000); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997). We give the trial court almost complete deference in determining historical facts, but we review de novo the trial court's application of the law to those facts. *Johnson v. State,* 68 S.W.3d 644, 652–53 (Tex.Crim. App.2002); *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App.2000).

### DFPS INTERVIEWS

■ In points of error one, two, three, and sixteen, appellant contends that the interviews of the juveniles at the YFZ Ranch by DFPS caseworkers violated the Fourth Amendment, article I, section 9, and article 38.23 because (1) the petition for the order in aid of investigation contained a material misstatement of fact regarding the department's compliance with the statutory prerequisites for obtaining the order; (2) the petition relied on information, specifically the phone calls to the family shelter hotline, obtained in violation of criminal statutes; and (3) the DFPS

caseworkers exceeded the scope of their authority under the order by interviewing every female resident of the YFZ Ranch between the ages of seven and seventeen. In points of error four, five, and six, appellant contends that information obtained during the DFPS interviews was the fruit of these constitutional and statutory violations, was improperly used in the April 6 probable cause affidavit, and should be disregarded in determining whether there was probable cause to issue the April 6 warrant. We overrule all of these points because we conclude that appellant does not have standing to contest the legality of the interviews.

■ The rights secured by the Fourth Amendment and article I, section 9 are personal. *See Rakas v. Illinois,* 439 U.S. 128, 139, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Richardson v. State,* 865 S.W.2d 944, 948–49 (Tex.Crim.App.1993). A defendant seeking to suppress evidence on the ground that it was obtained in violation of the Fourth Amendment or article I, section 9 must show that he personally had a reasonable expectation of privacy that the government violated. *Rakas,* 439 U.S. at 139–40, 99 S.Ct. 421; *Handy v. State,* 189 S.W.3d 296, 299 (Tex.Crim.App.2006); *Kothe v. State,* 152 S.W.3d 54, 59 (Tex. Crim.App.2004); *Richardson,* 865 S.W.2d at 948–49. The same standing requirement obtains under article 38.23. *Fuller v. State,* 829 S.W.2d 191, 202 (Tex.Crim.App. 1992).

To establish his standing at the suppression hearing, appellant filed an affidavit stating:

My name is Michael Emack. . . . I resided in a home on the YFZ Ranch, 2420 County Road 300 (Rudd Road) in Schleicher County, Texas on April 3, 2008 and on April 6, 2008, when law enforcement officers and agents of the State of Texas entered the Ranch and

searched homes and buildings there. My home was entered and searched by law enforcement officers and agents of the State of Texas on those dates and afterward.... Numerous items belonging to me were seized from my home during these searches, including my photographs, my computers, my computer equipment, my computer storage devices, and my papers. I was the victim of the unlawful entry into, and searches of, and seizures from my residence on the YFZ Ranch that began on April 3 and April 6, 2008.

I have been a member of the [FLDS] all my life. Beginning April 3 and April 6, 2008, and continuing for several days, law enforcement officers and agents of the State of Texas entered various Church buildings on the YFZ Ranch, including the Temple, the Temple Annex, the Bishop's Office, the Bishop scribe's office, and the Big House, and seized computers, computer equipment, computer storage devices, religious records, papers, documents, books, photographs, and other items containing information about me. I was the victim of the unlawful entry into, and the searches of, and the seizures from, these Church buildings....

Although the State does not question appellant's showing of standing to contest the validity of the searches conducted pursuant to the April 3 and 6 warrants, the State contends that appellant failed to establish his standing to challenge the interviews conducted by the DFPS caseworkers acting pursuant to the order in aid of investigation. The State argues that appellant failed to show that he had a reasonable expectation of privacy that was invaded by the interviews.

■ Responding to the State's argument, appellant concedes that he does not have vicarious standing to invoke the rights of the juveniles who were interviewed by the DFPS caseworkers. He asserts, however, that this is of "no consequence" because his challenge to the manner in which the interviews were conducted is merely "a predicate to the challenge of the subsequent search warrant." If by this appellant is asserting that he has standing to challenge the DFPS interviews because those interviews provided information used to obtain the second search warrant, the argument fails. For a defendant to have standing on a motion to suppress evidence, it is not sufficient that he "claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *see also Rakas*, 439 U.S. at 132–33, 136–37, 99 S.Ct. 421 (rejecting "target" theory of standing); *Fuller*, 829 S.W.2d at 201–02 (holding that defendant did not have standing under art. 38.23 to object to admission of evidence unlawfully obtained from another person). That information learned during the DFPS interviews was used to obtain the second search warrant does not, in itself, give appellant standing to challenge the legality of those interviews.

■ Appellant further argues that he has standing to challenge the DFPS interviews because they were the fruit of his unlawful detention, and that of others living on the ranch, beginning on April 3 when the officers and caseworkers arrived to execute the first search warrant and the order in aid of investigation. Appellant argues by analogy to *Kothe*. In that case, Kothe's automobile was stopped by an officer who suspected that the driver, Kothe, was intoxicated. 152 S.W.3d at 58. The officer quickly satisfied himself that Kothe was not intoxicated, but he continued to detain Kothe and ultimately found drug

paraphernalia in the car and heroin on the person of Kothe's passenger, Brantley. *Id.* Kothe moved to suppress the heroin, claiming that his continued detention after the officer determined that he was not intoxicated was constitutionally unreasonable. The trial court granted the motion to suppress and the State appealed, urging that Kothe did not have standing to challenge the search of Brantley. *Id.* The court of criminal appeals held that while Kothe did not have a reasonable expectation of privacy in the balloons of heroin secreted in Brantley's clothing, he did have standing to challenge his own detention and any fruits of that detention, which under those facts included the search of Brantley. *Id.* at 60–62.

As the court of criminal appeals noted in *Kothe,* it is critical to identify the precise government conduct being objected to, because this often will be determinative of the standing issue. *Id.* at 60. In his points of error complaining of the DFPS interviews, appellant contends that the interviews, and the information they revealed, were the fruit of unlawful conduct by DFPS employees, to whom he argues the Fourth Amendment applies. *See Roe v. Tex. Dep't of Protective & Regulatory Servs.,* 299 F.3d 395, 401 (5th Cir.2002). He contends that DFPS agents violated the Fourth Amendment, and also article I, section 9 and article 38.23, by making a false statement of material fact and using unlawfully obtained evidence in their petition for order in aid of investigation, and by thereafter exceeding the scope of their authority under the order. These contentions are not based on any assertion that appellant was unlawfully detained on April 3, and they do not require a determination as to whether or not appellant was unlawfully detained in order to be resolved.

The order in aid of investigation directed the "parent or person responsible" for the care of Sarah Jessop Barlow and her infant daughter to "immediately allow an authorized representative of the Department of Family and Protective Services to enter ... [the YFZ Ranch] to interview and examine the children...." Appellant did not claim to be the parent or person responsible for the care of any of the children interviewed by the DFPS caseworkers. In his affidavit in support of standing, appellant affirmed that he was a resident of the YFZ Ranch and a member of the FLDS, that his personal residence was searched and his personal property was seized, and that FLDS premises were searched and church property was seized. Appellant's challenges to the manner in which the DFPS obtained the order in aid of investigation and to the scope of the interviews conducted by its caseworkers under the order are not based on any allegation that the conduct complained of violated appellant's asserted privacy interests or that the interviews were a fruit of a violation of those interests.

Points of error one through three and, as applied to the DFPS order, points of error four through six and sixteen are overruled.

### APRIL 3 WARRANT

▇ In points of error seven through twelve, sixteen, and seventeen through nineteen, appellant contends that the search of the YFZ Ranch pursuant to the April 3 warrant violated the Fourth Amendment, article I, section 9, and article 38.23 because (1) the probable cause affidavit on which the warrant was based contained material misstatements and omissions of fact; (2) the telephone calls to the family crisis hotline on which the affidavit relied were not credible and did not support a finding of probable cause to believe that a crime had been committed; (3) the telephone calls to the shelter hot-

line were obtained in violation of criminal statutes; and (4) the warrant was general and overbroad. In points of error four, five, and six, appellant contends that information obtained during the first search was tainted by these constitutional and statutory violations, was improperly used in the April 6 probable cause affidavit, and should be disregarded in determining whether there was probable cause to issue the April 6 warrant. We do not address the merits of appellant's challenges to the April 3 search, however, because the information gathered during the search was not critical to a finding of probable cause to issue the April 6 warrant.

In his April 6 probable cause affidavit, Long stated that while conducting a search of the ranch pursuant to the first warrant, he saw computers, vaults, and locked drawers inside the temple and temple annex. He also saw several beds in the temple, in one of which the linens were disturbed and there was a strand of what Long believed, due to its length, was female hair. He also saw a document indicating marriages between one man and over twenty wives. Even if this information is redacted from the April 6 affidavit, what remains—the information gathered during the DFPS interviews and received from the confidential informer—was more than sufficient to give the magistrate a substantial basis for concluding that there was probable cause to believe that the offenses of sexual assault of a child and bigamy had been and were being committed at the YFZ Ranch and to issue a warrant to search for evidence of those offenses. *See Illinois v. Gates,* 462 U.S. 213, 236–37, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (decision to issue warrant will be sustained if magistrate had substantial basis for concluding that probable cause was shown); *State v. Delagarza,* 158 S.W.3d 25, 29 (Tex.Crim.App.2005) (same); *Swearingen v. State,* 143 S.W.3d 808, 811 (Tex.

Crim.App.2004) (same); *State v. Davila,* 169 S.W.3d 735, 738 (Tex.App.-Austin 2005, no pet.) (same).

Accordingly, points of error four through six (as applied to the April 3 warrant), seven through twelve, sixteen (as applied to the April 3 warrant), and seventeen through nineteen are overruled.

## FRANKS V. DELAWARE

■ In points of error thirteen, fourteen, and fifteen, appellant contends that the evidence seized during the April 6 search should have been suppressed because material facts were omitted from the April 6 probable cause affidavit. The Fourth Amendment requires that a defendant be allowed to challenge the veracity of a probable cause affidavit "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Although appellant also cites article I, section 9 of the Texas Constitution and article 38.23, he does not separately argue his state claims or present any argument asserting that these provisions afford him greater protections than the Fourth Amendment as construed in *Franks.* Accordingly, these state law contentions present nothing for review. *See Manns v. State,* 122 S.W.3d 171, 192 n. 97 (Tex.Crim.App.2003).

By its express terms, the holding in *Franks* applies only to affirmative misstatements contained in a probable cause affidavit. Neither the Supreme Court nor the court of criminal appeals has held that *Franks* applies to omissions of fact, although several lower courts have so held.

*See Darby v. State,* 145 S.W.3d 714, 722 (Tex.App.-Fort Worth 2004, pet. ref'd) (collecting cases); *see also Massey v. State,* 933 S.W.2d 141, 146 n. 3 (Tex.Crim. App.1996) ("This Court has indicated that we might not recognize application of *Franks* to omissions of fact."); 40 George E. Dix & John M. Schmolesky, *Texas Practice: Criminal Practice and Procedure* § 9:26 (3d ed. 2011) (stating that omitted fact could be considered material under *Franks* if its inclusion would render affidavit insufficient to show probable cause). For the purpose of this opinion, we will assume without deciding that *Franks* does apply to omissions of fact.

 At a *Franks* hearing, it is the defendant's burden to prove the alleged perjury or reckless disregard for the truth by a preponderance of the evidence. *Franks,* 438 U.S. at 156, 98 S.Ct. 2674. If the defendant satisfies this burden, and if, with the false material set aside, the remainder of the affidavit is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. *Id.* We review the trial court's ruling on a *Franks* issue under the same standard applied to search and seizure issues generally: we give almost total deference to the court's rulings on questions of historical fact and mixed questions of law and fact that turn on an evaluation of credibility and demeanor, but we review de novo the trial court's application of the law to those facts. *Fenoglio v. State,* 252 S.W.3d 468, 473 (Tex.App.-Fort Worth 2008, pet. ref'd); *see Johnson,* 68 S.W.3d at 652–53; *Carmouche,* 10 S.W.3d at 327.

 The facts appellant contends were omitted from the April 6 probable cause affidavit are: (1) the sixteen-year-old caller who identified herself as Sarah Jessop Barlow was not found at the ranch during the initial search, and (2) Dale Barlow, the person suspected of sexually assaulting the caller, was located in Arizona before the first warrant was executed. Relevant to these omissions, the trial court found:

● Before the April 3 search warrant was executed, Sheriff Doran received a cell phone call from a person claiming to be Dale Evans Barlow. Doran told this caller to "contact the law enforcement where he [the caller] was located" within thirty minutes. Doran never received notice that the caller made such contact.

● "[N]o credible evidence was introduced to support the ... claim ... that Ranger Long intentionally or knowingly or with reckless disregard for the truth omitted relevant information in his [April 6] probable cause affidavit[ ]."

● "[N]o credible evidence was introduced to support the ... claim ... that Ranger Long acted in reckless disregard for the truth in preparing and presenting the [April 6] probable cause affidavit[ ]."

● "[N]o credible evidence was introduced to support the ... claim ... that Ranger Long entertained doubts, much less serious doubts, about the truth of the allegations in the [April 6] probable cause affidavit[ ]."

● "[T]he Defendants failed to present credible evidence to support the claims ... that the Ranger's probable cause affidavits knowingly or intentionally contained either deliberate falsehoods, deliberate omissions or reckless disregard for the truth."

● "Ranger Long did not deliberately or recklessly omit information from either probable cause affidavit and ... if there were any unintentional omission[s] their inclusion would not have resulted" in the magistrate's refusing to issue the warrants.

In light of the trial court's findings regarding the weight and credibility of the evidence adduced at the *Franks* hearing, we hold that appellant did not show that Long omitted material facts from the April 6 affidavit either deliberately or with a reckless disregard for the truth.

Points of error thirteen, fourteen, and fifteen are overruled.

## RELIGIOUS FREEDOM

■■■ In point of error twenty-one, appellant contends that the searches of the YFZ Ranch violated his rights under the Free Exercise Clause of the First Amendment. In point of error twenty, appellant contends that the searches violated the Texas Religious Freedom Restoration Act (TRFRA). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 110.001–.012 (West 2011). That act provides that a government agency may not substantially burden a person's free exercise of religion unless the agency demonstrates that the application of the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *Id.* § 110.003(a), (b). Appellant urges that information learned and evidence seized during the searches should have been suppressed pursuant to article 38.23 as having been obtained in violation of the Free Exercise Clause and TRFRA.

■■■■ The TRFRA defines "free exercise of religion" as "an act or refusal to act that is substantially motivated by sincere religious belief." *Id.* § 110.001(a)(1). The focus of the act is on the degree to which a person's religious conduct is curtailed and the resulting impact on the person's religious expression. *Barr v. City of Sinton,* 295 S.W.3d 287, 301 (Tex.2009). A person's religious exercise has been substantially burdened under the TRFRA when his ability to express adherence to his faith through a particular religiously

motivated act has been meaningfully curtailed or he has otherwise been significantly pressured to modify his conduct. *Id.* at 302.

The Supreme Court has said that the Fourth Amendment "must not be read in a vacuum," and that "[a] seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Roaden v. Kentucky,* 413 U.S. 496, 501, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). Citing *Roaden,* appellant argues that a magistrate should take into consideration the values protected by the Free Exercise Clause before issuing a warrant to search a place of religious worship. In *Roaden,* the Supreme Court held only that the police may not rely on the exigency exception to the Fourth Amendment warrant requirement to make a seizure of allegedly obscene materials. *Id.* at 506. The Court has eschewed "any suggestion that the standard of probable cause in the First Amendment area is different than in other contexts...." *New York v. P.J. Video,* 475 U.S. 868, 875, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986). Instead, "the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally." *Id.*

Appellant does not point to evidence that would support a finding that the searches conducted at the YFZ Ranch curtailed his ability to express adherence to his faith through a particular religiously motivated act or that the searches otherwise pressured him to modify his religious conduct. Similarly, appellant has not shown that the searches at issue limited his First Amendment right to freely exercise his religious faith. Because the searches were not shown to violate the Free Exercise Clause or TRFRA, we over-

rule points of error twenty and twenty-one.

The judgment of conviction is affirmed.

## APPENDIX:

### APRIL 6, 2008, PROBABLE CAUSE AFFIDAVIT

Affiant has probable cause for said belief by reason of the following facts, to-wit: Affiant is Leslie Brooks Long, a certified peace officer under the laws of the State of Texas for approximately 19 years. Affiant is currently employed by the Texas Department of Public Safety as a Texas Ranger and has investigated criminal offenses in the State of Texas, including the criminal offense of Sexual Assault of a Child. Affiant has received training from the Texas Department of Public Safety Training Academy in Austin, Texas, including specialized Criminal Law Enforcement training in reference to offenses identified as Sexual Assault of a Child. Affiant has personally been on the premises of the YFZ Ranch on multiple occasions over the past four years and knows that it is located as described above as the Suspected Place and Premises. Also, Affiant has now been to the Suspected Place and Premises on April 4, 2008, April 5, 2008, and April 6, 2008, for many hours each day. At the Suspected Place and Premises, Affiant entered the gate described in the Suspected Place and Premises, drove further onto the property and observed another fence and gate within the ranch. At the interior gate, Affiant observed a small, enclosed, roofed building with tinted windows and antennae believed to be used in the purpose of communications. This structure is built a few feet above ground. Based on these observations and Affiant's training and experience, Affiant believes this building is a surveillance platform, guard tower or guard house. Affiant has personally spoken with Frederick Merril Jessop, as recently as April 5, 2008, who identified himself as the point of contact to law enforcement involving any requests or needs from the YFZ Ranch, hereafter referred to as the Suspected Place and Premises. Affiant has personally observed other persons at the YFZ Ranch seek authorization from Frederick Merril Jessop to respond to questions from law enforcement and other government officials. Frederick Merril Jessop advised Affiant that Frederick Merril Jessop resides at the Suspected Place and Premises and has presented himself to Affiant as the authority at the Suspected Place and Premises. Affiant observed that numerous other people were present at the Suspected Place and Premises and Frederick Merril Jessop on April 4, 2008, advised Affiant that around two hundred fifty men, women and children reside at the Suspected Place and Premises. The occupants of the residential structures on the Suspected Place and Premises have been not been identified to Affiant.

On April 5, 2008, while conducting a search of the Suspected Place and Premises under authority of Search and Arrest Warrant number M–08–001–S, out of the 51st Judicial District of Texas, for the County of Schleicher, a copy of which is attached hereto with accompanying affidavit as "Attachment A" for all purposes, Affiant made the following observations: within a large building, that Affiant heard the residents at the Suspected Place and Premises refer to as a Temple, hereafter referred to as the "Temple," Affiant observed multiple locked safes, locked desk drawers, locked vaults, as well as multiple computers and beds. On one of the beds within the Temple, Affiant observed that the bed linens were disturbed as if the bed had been used and Affiant observed a strand of hair believed to have come from the head of a female. Affiant believes the

strand of hair belongs to a female because Affiant has seen numerous male residents at the Suspected Place and Premises and all of the males observed by Affiant wear their hair shorter than the strand of hair observed by Affiant.

On April 5th and 6th, 2008, Affiant observed a building similar in appearance to the Temple, but smaller in size that is built away from the Temple, that Affiant will hereafter refer to as the Temple Annex. Inside the Temple Annex, Affiant observed multiple safes and a computer and computer peripherals.

On April 6, 2008, Affiant has personally spoken with Tina Martinez, an employee with the Texas Department of Protective and Family Services who personally interviewed a child who identified herself as Yvonne Jessop on April 4th or 5th of 2008; Yvonne Jessop said she is fifteen years of age; that Yvonne Jessop knows a child named Suzanne Johnson who is sixteen years of age and was spiritually united (married); Yvonne Jessop further advised Tina Martinez that Suzanne Johnson had a baby and is pregnant and resides at the Suspected Place and Premises.

Tina Martinez also advised Affiant that she interviewed a child on April 4, 2008, who appeared to be approximately sixteen years of age who identified herself as Lee Ann Nelson Jessop; that Tina Martinez asked Lee Ann Nelson Jessop her age in the presence of Lee Roy Jessop; that, before responding to Tina Martinez' question, Lee Ann Nelson Jessop looked at Lee Roy Jessop; that Lee Roy Jessop told Lee Ann Nelson Jessop, "you are eighteen;" after which Lee Ann Nelson Jessop advised that she is eighteen with a date of birth of March 24, 1990; that Lee Ann Nelson Jessop advised Tina Martinez that she has a baby that is ten months old, that she is spiritually united with Lee Roy Jes-

sop who is approximately thirty-three years of age; that Lee Ann Nelson Jessop is the fourth wife of Lee Roy Jessop who is still married to the other three wives.

On April 6, 2008, Tina Martinez further advised Affiant that, between this date and April 4, 2008, she interviewed a child who identified herself as Pamela Jessop with a date of birth of 12/9/1989 who advised that she has a son named Matthew Jessop who was born 8/1/2006; that Pamela Jessop advised that the father of Matthew Jessop is Jackson Jessop who is thirty-six years old.

On April 6, 2008, Tina Martinez advised Affiant that, between this date and April 4, 2008, Tina Martinez interviewed a female who identified herself as Janet Jeffs Jessop with a date of birth of 9/16/1988 who advised Tina Martinez that she has a daughter named Diana Ziana Jessop who was born 8/19/2005 and she has another daughter named Spiritual Unity Jessop who was born 8/12/2004.

Also on April 6, 2008, Affiant has personally spoken with Ruby Gutierrez, an employee with the Texas Department of Protective and Family Services who personally interviewed a child who identified herself as Josie Steed between this date and April 4, 2008. Ruby Gutierrez advised Affiant that Josie Steed told Ruby Gutierrez that a resident of the Suspected Place and Premises, Sarah Johnson, is sixteen and has been spiritually united (married) to Joseph Jeffs who is approximately forty years of age.

Also on April 6, 2008, Affiant has personally spoken with Rebecca Baxter, an employee with the Texas Department of Protective and Family Services who, between this date and April 4, 2008, has personally interviewed a child who identified herself as Teresa Steed Jessop, with a date of birth of sixteen years of age; Teresa Steed Jessop advised Rebecca Baxter

that Teresa Steed Jessop is pregnant and due to give birth in June 2008 and that Teresa Steed Jessop is married to Nathan Jessop whose first wife, to whom Nathan Jessop is also still currently married, is approximately forty years of age.

On April 6, 2008, Rebecca Baxter also advised Affiant that, between this date and April 4, 2008, she interviewed a female who appeared to be approximately sixteen years of age, identified herself as Arta Jessop Barlow, and advised Rebecca Baxter that Arta Jessop Barlow does not know her own age, but that she has given birth to a child who is now two years old and that she is currently pregnant again. On April 6, 2008, Rebecca Baxter advised Affiant that, between this date and April 4, 2008, she interviewed a child who identified herself as Viola Barlow, age 8, who advised that: Arta Jessop Barlow has four children and Arta Jessop Barlow is under sixteen years of age; that Arta Jessop Barlow is spiritually united to Richard Jessop Barlow; that Richard Jessop Barlow is the father of Viola Barlow; that Viola Barlow's mother, Susan Black Barlow, is the first wife of Richard Jessop Barlow; that Arta Jessop Barlow is the second wife of Richard Jessop Barlow; and that both wives are still alive and married to Richard Jessop Barlow.

Affiant has been advised by Schleicher County Sheriff David Doran that Sheriff Doran has worked with residents at the Suspected Place and Premises over the past four years. Sheriff Doran advised Affiant that he has learned from the residents at the Suspected Place and Premises that the residents all belong to the religious group the Fundamentalist Church of Jesus Christ of Latter–Day Saints (hereafter referred to as FLDS). On April 6, 2008, Sheriff Doran advised Affiant that, over the past four years, Sheriff Doran has worked with a confidential informant who is a former member of the FLDS; that the confidential informant has provided Sheriff Doran with information regarding the FLDS on more than twenty occasions over the past several years and, that on each occasion, the information was proven to be reliable, true and correct; that the confidential informant has continued to provide Sheriff Doran reliable information as recently as April 5, 2008; that, on April 5, 2008, the confidential informant advised Sheriff Doran of the following: that adult male FLDS church members over the age of seventeen engage in the practice of marrying multiple wives, at the initial time of the marriage, the bride is often under the age of sixteen years: and that the temple at the Suspected Place and Premises contains an area where there is a bed where males over the age of seventeen engage in sexual activity with female children under the age of seventeen.

As stated above, on April 5, 2008, Affiant observed a bed within the Temple that has disturbed bed linens and a strand of hair that appears to be from a female head.

Furthermore, while conducting a search of the Suspected Place and Premises under the authority of Search Warrant number M–08–001–S, on April 5, 2008, Affiant while agents were searching for documents pertinent to that Search Warrant, Affiant personally observed a document indicating marriages between one man and over twenty wives, all of whom resided in the same residence at the Suspected Place and Premises, as of August 9, 2007, with no record of divorce or death of a spouse found.