

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-14-00649-CR

Alex Rene **GONZALES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2013CR7573
Honorable Maria Teresa Herr, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Jason Pulliam, Justice

Delivered and Filed:  November 10, 2015

AFFIRMED

Appellant Alex Rene Gonzales was arrested for driving while intoxicated and his blood was drawn and tested pursuant to a search warrant. In the affidavit supporting the search warrant, the arresting officer repeated statements of a witness identified only as "W1." On appeal, Gonzales makes two complaints about the arresting officer's affidavit in support of the search warrant. First, Gonzales argues the four corners of the affidavit did not establish probable cause because the witness to which the affidavit refers is not sufficiently described. Second, Gonzales contends the arresting officer made a material misrepresentation in the affidavit because he failed to state in the

affidavit that he had not in fact talked to the witness but had learned about the witness's statements from another investigating officer. We affirm the judgment of the trial court.

## BACKGROUND

On June 28, 2013, Gonzales was arrested for driving while intoxicated, third offense. He refused all sobriety tests and refused to submit to a breath test. Officer Rodney Magee, the arresting officer, then signed an affidavit and obtained a search warrant to take a sample of Gonzales's blood for testing. The results indicated a blood-alcohol level of .12.

Gonzales filed a motion to suppress the blood evidence, alleging an illegal seizure unsupported by probable cause. At the suppression hearing, Officer Magee was the only witness to testify. He testified that on June 28, 2013, he was on patrol when he responded to a call that there was a car stopped at an intersection with a female and a male passed out inside. When Officer Magee arrived at the scene, other officers were already present. Officer Magee saw that there was a car stopped "right at the intersection." "It was in the number two lane, fast lane, being the far left . . . so right in the middle of the road." Officer Magee saw another officer, Officer Gratavski, speaking to a witness. Officer Magee testified he learned the witness had said Gonzales had been passed out in the driver's seat of the car while the car's engine was running. According to the witness, Gonzales had been slumped over into the lap of the female who, while sitting in the passenger seat, had also been slumped over Gonzales. The witness knocked on the window of the car, and when Gonzales and the female woke up, the witness took the keys out of the car's ignition.

Officer Magee testified that by the time he was at the scene, Gonzales and the female were already out of the car. Officer Magee began talking with Gonzales who, according to Officer Magee, was acting very "defensive." Officer Magee asked Gonzales where he had been coming from, and Gonzales replied, "I wasn't driving." Gonzales then told Officer Magee he had been coming from a concert in Helotes. When Officer Magee asked Gonzales other questions, he again

replied, "I wasn't driving." Officer Magee testified that Gonzales then became aggressive and had to be secured with handcuffs. According to Officer Magee, in speaking with Gonzales, he could smell a moderate odor of alcohol on Gonzales's breath. Officer Magee also noticed that Gonzales was unsteady on his feet and had confused speech. At times Gonzales had to rephrase, "kind of go back and say again what he wanted to say with the correct words." Further, Gonzales's eyes were "glassy." Officer Magee believed that Gonzales showed signs of intoxication, so he asked Gonzales if he had had anything to drink. Gonzales replied, "Very little, if anything at all." Gonzales refused standard field sobriety tests. He was then placed under arrest for driving while intoxicated. As a basis for arresting Gonzales, Officer Magee testified that "[a]ll clues [had been] observed." Officer Magee noted that Gonzales was "unsteady on his feet," smelled of alcohol, had "glassy eyes," had "confused" and "slurred speech," and was "passed out at the intersection with the motor running." According to Officer Magee, in making the decision to arrest Gonzales, he relied on "[j]ust all the totality of circumstances."

On cross-examination, Officer Magee admitted that he had never seen Gonzales driving the car. Officer Magee also could not remember if he had ever spoken directly with the witness who had taken Gonzales's car keys out of the car's ignition. Officer Magee testified that he believed all the information with respect to this witness was communicated to him through Officer Gratavski.

At the conclusion of the suppression hearing, the trial court denied Gonzales's motion to suppress. At trial, Gonzales again urged his motion to suppress based on the affidavit being insufficient. It was again denied.

At trial, the witness who had taken the keys out of Gonzales's car, Jesus Chavez, testified. Chavez testified that on June 28, 2013, at about 11:00 p.m., he was heading to his gym and was driving on Bandera Road when he "saw a lot of cars ahead of [him] going left and right to avoid a

vehicle that was parked in the street." Chavez almost hit the car himself and had to "slam" on his brakes. Although the light at the intersection was green, the car did not move. According to Chavez, except for taillights indicating that the brakes were on, the car did not have any lights on at all. The light at the intersection then turned red. The light at the intersection then turned green again, but there was still no response from the car. Chavez then honked his horn. There was still no response. So, Chavez decided to check to see if the driver of the car was okay. Chavez put on his flasher indicators and got out of his pickup truck. Chavez went to the driver's side of the car and noticed the windows of the car were down. Chavez saw Gonzales "slumped over like this with his hands in his lap facing upwards like this." Chavez saw a passenger, a woman, who was also "passed out." Chavez explained that he said "passed out because she was leaned over, completely hunched over with her hair in the car." Chavez knew Gonzales and the woman were passed out because he could smell "the strong presence of alcohol." According to Chavez, there was no one else in the car.

Chavez testified Gonzales was sitting in the driver's seat. The car was on, in drive, and the radio was "blaring." Chavez checked Gonzales for a pulse. Chavez then called 911 and said "[t]here's an individual with a running vehicle in the street that could have easily took off." Chavez asked if the dispatcher wanted him to put the car in park. When the dispatcher replied yes, Chavez put the car in park and removed the car keys from the ignition. The woman passenger then began vomiting and woke up. She looked at Chavez and started punching Gonzales, yelling that someone was trying to steal Gonzales's car. Gonzales woke up and became "very physically aggressive." Gonzales wanted his keys back. Chavez replied that he was not getting his keys back. Gonzales wanted to leave and demanded his keys. Chavez told Gonzales that he was drunk, he was not getting his keys back, and the police had already been called. Chavez testified Gonzales tried to charge him but then tripped and fell. According to Chavez, Gonzales "reeked of alcohol" and

"could not walk in a straight line if [Chavez] drew one three-feet wide." Chaves testified that after Gonzales charged him, the woman passenger decided to try to take Chavez's truck. "So she ran to [his] truck, ran into it. Literally ran into [his] truck." Chavez then ran back to his pickup truck, put it in drive, and parked it around the corner, waiting for the police to arrive. Chavez saw Gonzales and the woman passenger walking around their car. Then, Chavez saw the flashing lights of the police. Chavez still had Gonzales's car keys. Three patrol cars arrived on the scene. When a female officer came towards Chavez, Chavez identified himself as the witness who had called 911 and gave the officer the keys to the car. Chavez testified he told the officer what had happened. The officer thanked him and told him to wait in his pickup truck.

Officer Magee testified about the same facts as he did during the suppression hearing. He also testified that generally, when investigating an incident, one officer has the reporting responsibility. According to Officer Magee, he was that officer in this case. Officer Magee also noted that at the scene, Gonzales had claimed "Frank was driving." Gonzales claimed he had been sitting in the backseat of the car while "Frank" drove. Officer Magee testified that he had looked in the backseat of the car and saw "stuff piled up in the floorboard up above where the seat was," "kind of f[alling] into the seat." According to Officer Magee, he did not believe anyone could have been sitting back there. Officer Magee also testified that Gonzales said he had been "coming from Floore's County Store out of Helotes where they have concerts." Gonzales said he had been at Floore's for four hours, but did not have a single drink while there. Officer Magee testified that he did not find Gonzales's statements to be credible. As in the suppression hearing, Officer Magee testified he believed Gonzales was intoxicated "based on all the observations [he] made. "[T]he slurred speech, the glassy eyes, unsteady on his feet, the odor on his breath." "Based on the totality of circumstances, everything going on that night, just everything [he] observed, all the statements made from everyone."

Again on cross-examination, Officer Magee admitted that he never saw Gonzales behind the wheel of the car and that he had never spoken to the witness directly. Officer Magee admitted that everything he relied on with regard to the witness's statements he learned through Officer Gratavski.

Officer Juan Hernandez also testified at trial. He testified that he was the first officer who pulled up behind Gonzales's car and that the other officers arrived seconds after him. According to Officer Hernandez, the dispatch call was vague, reporting a man slumped over the steering wheel of a car. When Officer Hernandez arrived at the scene, both Gonzales and a female were outside of the car. Officer Hernandez testified that from what he observed, Gonzales appeared to be intoxicated. Officer Hernandez noted the "smell on [Gonzales's] breath, his stumbling, holding onto the car when he was walking around it," his slurred speech, and his aggressive manner. According to Officer Hernandez, Gonzales was "cussing almost in every sentence that he was saying." Officer Hernandez remembered Gonzales claiming that he and the female passenger had been riding in the backseat of the car. According to Officer Hernandez, he looked in the backseat and determined that it was physically impossible to be riding in the backseat. All over the backseat and floorboard were clothes and shoes. With regard to the witness, Officer Hernandez testified he never spoke to him.

Gonzales was found guilty of driving while intoxicated, third offense, and was sentenced to five years imprisonment and a $2,000 fine. His sentence was then suspended and he was placed on community supervision for a period of five years. He now appeals arguing that the affidavit in support of the search warrant was constitutionally insufficient because its four corners do not support probable cause and because Officer Magee made a material misrepresentation in the affidavit.

**FOUR CORNERS OF THE AFFIDAVIT IN SUPPORT OF THE SEARCH WARRANT**

Gonzales first argues the search warrant on its face was insufficient and thus violated the Fourth Amendment to the Constitution because the witness was not named or described in the search warrant. Under the Fourth Amendment, a search warrant cannot issue unless it is based on probable cause as determined from the four corners of the affidavit. *See* U.S. CONST. amend IV; *Flores v. State*, 319 S.W.3d 697, 702-03 (Tex. Crim. App. 2010). The four corners of an affidavit supporting a search warrant are sufficient if, from the totality of circumstances reflected in the affidavit, the magistrate was provided with a substantial basis for concluding that probable cause existed. *Swearingen v. State*, 143 S.W.3d 808, 810-11 (Tex. Crim. App. 2004). Probable cause for a search warrant exists if, under the totality of circumstances presented to the magistrate in an affidavit, there is at least a "fair probability" or "substantial chance" that evidence of a crime will be found. *Flores*, 319 S.W.3d at 702. The affidavit must contain sufficient information to allow the issuing magistrate to determine independently whether probable cause exists because the magistrate's decision "cannot be a mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239 (1983).

When reviewing a magistrate's decision to issue a warrant, we apply a deferential standard in keeping with the constitutional preference for a warrant. *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007); *Swearingen*, 143 S.W.3d at 810-11. Whether an affidavit provides a substantial basis for a magistrate's probable cause determination cannot be determined through a "magical formula." *Tolentino v. State*, 638 S.W.2d 499, 501 (Tex. Crim. App. [Panel Op.] 1982). Instead, when we review an issuing magistrate's determination of probable cause, we interpret the affidavit in a commonsense and realistic manner, recognizing that the magistrate may draw reasonable inferences. *Rodriguez*, 232 S.W.3d at 61. In emphasizing that affidavits should be read in a commonsense manner, the Supreme Court has pointed out that affidavits "are normally drafted

- 7 -

by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). "Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *Id.* "A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *Id.* The Court explained that "[t]his is not to say that probable cause can be made out by affidavits which are purely conclusory." *Id.* at 109. "Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police." *Id.* "However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *Id.*

Here, Officer Magee's affidavit stated the name and description of the suspect and affirmed that the suspect was presently in custody of the police and had "possession of and [was] concealing human blood, which constitute[d] evidence that the suspect committed the offense" of driving while intoxicated. The affidavit then listed the following facts as a basis for Officer Magee's belief that the suspect had committed the crime of driving while intoxicated:

(1) On the date specified in paragraph 4 above, at approximately 0:57 a.m., the suspect was operating a motor vehicle in a public place in Bexar County, Texas, namely BANDERA RD/MAINLAND DR

   i. W1 OBSERVED AP1'S[1] VEHICLE ON BANDERA AT MAINLAND, W1 OBSERVED THE VEHICLE SITTING AT THE INTERSECTION WHILE THE LIGHT WAS GREEN, W1 STATED AP1'S VEHICLE DID NOT HAVE ANY LIGHTS ON AND WAS ALMOST REAR-ENDED BY ANOTHER VEHICLE. W1 STATED HE EXITED THE VEHICLE TO MAKE SEE [SIC] WHAT WAS GOING ON AND OBSERVED AP1 SITTING IN THE DRIVER'S SEAT SLUMPED OVER AND AP2 IN THE PASSENGER SEAT, WITH THE VEHICLE RUNNING. W1 REACHED IN THE

---

[1] The first paragraph of the affidavit identifies Gonzales as "a suspected person ('AP1/SUSPECT')".

> VEHICLE AND PUT THE CAR IN PARK AND TURNED THE INGNITION OFF. AT THIS TIME AP2 WOKE UP, AND WOKE AP1 UP AND THEY EXITED THE VEHICLE SHORTLY AFTER WE ARRIVED.

Then, in the following paragraph B, Officer Magee affirmed that he had made the following observations of the suspect:

(1) the suspect had a moderate odor of alcohol;

(2) the suspect's speech was slurred and confused;

(3) the suspect's attitude was combative, insulting, cocky, profane, and sleepy;

(4) the suspect's balance was staggering, swaying, and unsure;

(5) the suspect's walking was staggering, swaying, and unsure; and

(6) the suspect's turning was hesitant and unsure.

In paragraph D, Officer Magee's affidavit stated "additional facts" that led him to believe the suspect was intoxicated while operating a motor vehicle in a public place:

> I SMELLED A MODERATE ODOR OF INTOXICANTS ON AP1'S BREATH AS HE SPOKE. I OBSERVED AP1 TO BE UNSTEADY ON HIS FEET AND SWAYING AS HE STOOD. AP1'S SPEECH WAS SLURRED AND CONFUSED. AP1'S EYES WERE GLASSY AS WELL.

In paragraph E, Officer Magee affirmed that AP1 "FIRST STATED HE DID NOT HAVE MUCH TO DRINK 'IF ANY.'" "THEN HE STATED HE DID NOT HAVE ANY DRINKS." In paragraph F, Office Magee affirmed that "[t]here was no open container." The remainder of the affidavit discussed Officer Magee's training and experience in these type of cases.

The four corners of this affidavit give specific facts and circumstances that would permit a magistrate to make a probable cause determination. Gonzales's issue with the affidavit is not with the specific facts listed but with the witness ("W1") not being described or named. Gonzales recognizes that an affidavit in support of a search warrant can contain hearsay. Indeed, although a

search warrant cannot be based *solely* on hearsay or conclusory statements, a search warrant affidavit may contain hearsay so long as a substantial basis for crediting the hearsay exists or corroborating facts within the officer's knowledge exist, respectively. *See Gates*, 462 U.S. at 241-43. Gonzales argues that the hearsay by the witness in this affidavit cannot be credited because the magistrate could not conclude a witness who was not described nor named was credible. According to Gonzales, the affidavit needed to specifically state exactly who "W1" was and what type of witness he was and whether he stayed at the scene and gave identifying information to the police officers. The State responds that naming a witness in an affidavit is not required and that it is clear from the affidavit that the witness was a bystander. We agree with the State.

First, with regard to whether a witness's name must be included in an affidavit, we note that naming a witness in an affidavit supporting a search warrant does not make a witness more or less credible in and of itself. The Fifth Circuit has recognized that "nothing is added to the affidavits by the naming of informants." *United States v. Martin*, 615 F.2d 318, 325 n.9 (5th Cir. 1980). That is, in looking at the four corners of an affidavit, a magistrate reading the name of an informant does not necessarily impart whether that person is credible. According to the Fifth Circuit, "[t]he naming of the informants places no facts relevant to their trustworthiness before the magistrate." *Id.*

Second, the reliability of bystanders or victim-eyewitnesses to a crime need not be established in the affidavit because "such persons are not intimately involved with the persons informed upon and with the illegal conduct at hand as other informants often are." *Id.* (quotations omitted). That is, "[t]he citizen informer is presumed to speak with the voice of honesty and accuracy." *State v. Duarte*, 389 S.W.3d 349, 356 (Tex. Crim. App. 2012). "The criminal snitch who is making a *quid pro quo* trade does not enjoy any such presumption; his motive is entirely self-serving." *Id.* Gonzales does not necessarily quibble with this statement of law. Instead,

Gonzales claims that the magistrate could not reasonably infer from the affidavit that the witness was a bystander or citizen informer. We disagree with Gonzales. The facts credited to the witness in the affidavit are so specific that a reasonable magistrate could conclude that the witness was a bystander or citizen informer. The affidavit is clear that the witness ("W1") was a bystander who happened upon the intersection where he saw Gonzales's car sitting with its lights off and saw another car almost hit Gonzales's car. And, the affidavit then makes clear that Officer Magee confirmed through his own observations other facts supporting the witness's account. Thus, a magistrate could reasonably conclude under the totality of circumstances presented to him in the affidavit that there was a "fair probability" or "substantial chance" that evidence of a crime would be found in Gonzales's blood.

**LOOKING OUTSIDE THE FOUR CORNERS OF THE AFFIDAVIT –
MATERIAL MISREPRESENTATION OR MATERIAL OMISSION?**

In his second issue, Gonzales argues that the affidavit contains a material misrepresentation pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), because the affidavit does not reflect that Officer Magee did not talk to the witness himself and instead learned of the witness's statements through another officer. Gonzales thus complains that the affidavit does not reflect this double-hearsay. The State responds that such a complaint is not about Officer Magee making a material misrepresentation in the affidavit—instead, the complaint is really that Officer Magee *omitted* a fact from the affidavit. We agree with the State. Gonzales does not point to an affirmative statement in the affidavit and claim that such a statement contained a material misrepresentation. Instead, Gonzales is arguing that a statement of fact has been omitted from the affidavit. Thus, we conclude that Gonzales's argument is based on whether Officer Magee made a material omission, not whether he made a material misrepresentation.

Since *Franks*, 438 U.S. at 155-56, defendants have been permitted to challenge the veracity of statements contained within an affidavit in support of a search warrant. According to the Court, pursuant to the Fourth Amendment, a defendant may challenge the veracity of such an affidavit "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Id.* Thus, under *Franks*, a defendant who makes a substantial preliminary showing that a false statement was made in a warrant affidavit knowingly and intentionally, or with reckless disregard for the truth, may be entitled to a hearing, on the defendant's request. *Harris v. State*, 227 S.W.3d 83, 85 (Tex. Crim. App. 2007) (citing *Franks*, 438 U.S. at 155-56). This hearing is required only where the false statement is essential to the probable cause finding. *Id.* If at the hearing the defendant establishes the allegation of perjury or reckless disregard by a preponderance of the evidence, the affidavit's false material is set aside. *Id.* If the remaining content of the affidavit does not then still establish sufficient probable cause, the search warrant must be voided and the evidence resulting from that search excluded. *Id.* An appellate court reviews the trial court's ruling on a *Franks* issue under the same standard applied to search and seizure issues generally. *Emack v. State*, 354 S.W.3d 828, 838 (Tex. App.—Austin 2011, no pet.). The appellate court gives almost total deference to the trial court's rulings on questions of historical fact and mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Id.* Questions of law are reviewed de novo. *Id.*

A.  *Should the analysis under* Franks *be extended to material omission contained within an affidavit supporting a search warrant?*

"By its express terms, the holding in *Franks* applies only to affirmative misstatements contained in a probable cause affidavit." *Emack*, 354 S.W.3d at 837. The State emphasizes in its

brief that neither the Supreme Court nor the Texas Court of Criminal Appeals has extended *Franks* to material omissions in affidavits supporting search warrants. In 2007, this court declined to extend *Franks*, explaining that the Texas Court of Criminal Appeals had yet to decide the issue. *See Aragon v. State*, 229 S.W.3d 716, 722 (Tex. App.—San Antonio 2007, no pet.) (citations omitted). However, since 2007, a number of Texas appellate courts have extended the *Franks* analysis to material omissions in a probable cause affidavit. *See Darby v. State*, 145 S.W.3d 714, 722 (Tex. App.—Fort Worth 2004, pet. ref'd); *Blake v. State*, 125 S.W.3d 717, 723-24 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Bosquez v. State*, 792 S.W.2d 550, 551 (Tex. App.—El Paso 1990, pet. ref'd); *Heitman v. State*, 789 S.W.2d 607, 610 (Tex. App.—Dallas 1990, pet. ref'd); *Melton v. State*, 750 S.W.2d 281, 284 (Tex. App.—Houston [14th Dist.] 1988, no pet.); *see also United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980). And, some Texas appellate courts, including the Texas Court of Criminal Appeals and this court, have assumed, but not decided, that *Franks* applies to omissions of fact contained within a probable cause affidavit. *See Renteria v. State*, 206 S.W.3d 689, 704 (Tex. Crim. App. 2006) (assuming application of *Franks* to omissions and concluding that even if the information omitted from the affidavit was included, sufficient probable cause existed to issue the search warrant); *Thom v. State*, 437 S.W.3d 556, 563-64 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (explaining that even presuming *Franks* applies to material omissions, the appellant did not request a *Franks* hearing or make a preliminary showing); *Emack v. State*, 354 S.W.3d 828, 838-39 (Tex. App.—Austin 2011, no pet.) (assuming without deciding that *Franks* applies to omissions in an affidavit and holding that the appellant did not show the officer omitted material facts from the affidavit either deliberately or with a reckless disregard for the truth); *Wise v. State*, 223 S.W.3d 548, 557 (Tex. App.—Amarillo 2007, pet. ref'd) (assuming *Franks* applies to omissions and holding even if omissions had been concluded, there was probable cause to issue the warrant); *Garza v. State*, 161 S.W.3d 636, 640 (Tex. App.—San

Antonio 2005, no pet.) (declining to extend *Franks* to omissions but addressing it in the alternative). Finally, it must be noted that in an unpublished opinion, this court did hold that *Franks* applied to material omissions in a probable cause affidavit:

> The Texas Court of Criminal Appeals has not recognized that a *Franks* analysis pertains to omissions as well as false statements. However, the Fifth Circuit, along with other Texas appellate courts, has concluded that allegations of material omissions are to be treated the same as claims of material misstatements. Accordingly, we will apply the *Franks* analysis to [the appellant]'s allegations.

*Lamarre v. State*, No. 04-11-00618-CR, 2013 WL 781778, at \*5 (Tex. App.—San Antonio Mar. 1, 2013, pet. ref'd) (not designated for publication). Thus, unlike in 2007, there is now much legal support for extending the analysis in *Franks* to material omissions contained in a probable cause affidavit.

Further, we note that the policies behind the Supreme Court holding in *Franks* also apply to material omissions contained in probable cause affidavits. The "bulwark of Fourth Amendment protection . . . is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Franks*, 438 U.S. at 164. In *Franks*, the Court noted that there were strong arguments against allowing veracity challenges to probable cause affidavits; however, the Court concluded that these arguments were "insufficient to justify an *absolute* ban on post-search impeachment of veracity." *Id.* at 166 (emphasis in original). The Court then emphasized the "pressing considerations" in favor of permitting veracity challenges. *Id.* First, the Court explained that "a flat ban on impeachment of veracity could denude the probable cause requirement of all real meaning," for a police officer could deliberately resort to false allegations and "remain confident that the ploy was worthwhile." *Id.* at 168. Second, the Court noted that because the hearing before the magistrate is "necessarily *ex parte*" and "frequently . . . marked by haste," it will not always "suffice to discourage lawless or reckless misconduct." *Id.* at 169. Third, the Court explained that in a previous opinion, it had

already rejected the notion that alternative sanctions were likely "to fill the gap." *Id.* (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)). Fourth, the Court stated that because a magistrate's determination was already subject to appellate review, allowing veracity challenges "would not diminish the importance and solemnity of the warrant-issuing process." *Id.* Fifth, the Court rejected the argument that a veracity challenge would "confuse the issue of the defendant's guilt with the issue of the State's possible behavior," because such a hearing would not be in the presence of the jury and issues extraneous to guilt were already considered in probable cause reviews upon a motion to suppress. *Id.* at 170. Finally, the Court explained that allowing veracity challenges to probable cause affidavits would not truly amount to an extension of the exclusionary rule to a "new" area because there is "no principled basis for distinguishing between the question of the sufficiency of an affidavit, which also is subject to a post-search re-examination, and the question of its integrity." *Id.* at 171. In examining these "pressing considerations," the Court refused to ban veracity challenges to probable cause affidavits. *Id.* Instead, recognizing the competing interests at stake, the Court created a high burden on the challenger, who was required to prove "deliberate falsehood" or "reckless disregard for the truth" and then materiality of the content misrepresented. *Id.* All of these "pressing considerations," which the Court found necessitated the imposition of the *Franks* test to challenges of veracity, apply equally to challenges of material omissions.

We therefore hold that *Franks* does apply to challenges of material omissions contained in probable cause affidavits.

B. ***The* Franks *standard as applied to material omissions contained in probable cause affidavits***

Applying the *Franks* analysis to material omissions requires varying the analysis somewhat. At the *Franks* hearing, a trial court would determine whether the defendant proved by a preponderance of the evidence (1) the omissions were in fact made and (2) they were made

intentionally or with a reckless disregard for the accuracy of the affidavit. *Martin*, 615 F.2d at 328. If the defendant carries this burden, the trial court would determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause for the defendant's arrest. *Id.* If, after including the omitted material, the affidavit did not establish probable cause, then the search warrant would be voided and the fruits of the search excluded. *See id.*

### (1) *Did Gonzales prove that Officer Magee omitted the fact knowingly and intentionally, or with reckless disregard for the truth?*

Gonzales complains that Officer Magee omitted from his affidavit the fact that he did not speak to the witness himself. Instead, Officer Magee spoke with another officer who spoke with the witness. At the suppression hearing and later at trial, Officer Magee testified that he did not speak directly to the witness and that another officer relayed to him what the witness had said. Chavez, the witness in question, testified that at the scene, he spoke with a female officer. Thus, Gonzales did show that Officer Magee's affidavit did, in fact, omit that he did not speak with the witness but obtained information about the witness's statements from another officer.

With regard to whether these omissions were made intentionally or with reckless disregard for the accuracy of the affidavit, Gonzales argues that because "Magee knew he had not spoken with this witness, omitting this fact was clearly done intentionally and knowingly." We disagree with Gonzales. From both Officer Magee's testimony at the suppression hearing and the testimony from all the witnesses at trial, it is clear that all four officers were part of the investigation and that Officer Magee was just the one who ended up being the reporting officer – that is the officer who wrote the report. As the officer coordinating the oral reports from all the other officers, his omission could have reasonably been attributed to mere negligence. Therefore, the trial court did

not err in determining Gonzales failed to show that Officer Magee made the omission intentionally or with disregard to the truth.

#### (2) *Was this omission material?*

Further, even if Gonzales had made a showing that Officer Magee made the omission intentionally or with reckless disregard to the truth, Gonzales still has not shown that the omission was material. In this case, placing the omitted information into the affidavit (that is, that Officer Magee learned of the witness's statements from another officer) would make no difference to the probable cause determination. Gonzales argues that placing the omitted information into the affidavit would show the witness's statements were hearsay within hearsay. However, double hearsay may be used in an affidavit to show probable cause if the underlying circumstances indicate a substantial basis for crediting each level of hearsay. *State v. Walker*, 140 S.W.3d 761, 766 (Tex. App.—Houston [14th Dist.] 2004, no pet.). As explained previously, there is a substantial basis for crediting the witness's statements in the affidavit because the magistrate could reasonably infer W1 was a citizen informer. *See Gates*, 462 U.S. at 233-34. With regard to the other level of hearsay, Officer Magee learning the information from the other officer, the Supreme Court has explained that an officer can rely on information gained through other officers over the course of an investigation. In *United States v. Ventresca*, 380 U.S. 102, 111 (1965), the Supreme Court stated that "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." Thus, even if the omitted information were included in the affidavit, there would be a substantial basis for crediting the hearsay at each level. Therefore, the trial court did not err in determining that Gonzales failed to show that the omission in this case was material.

## CONCLUSION

In looking at the four corners of Officer's Magee's affidavit in support of the search warrant, we hold that the magistrate could reasonably conclude under the totality of the circumstances that there was a fair probability or substantial chance that evidence of a crime would be found in Gonzales's blood. Further, we conclude that an affidavit in support of a search warrant may be challenged on the basis of a material omission under a modified *Franks* analysis. However, because application of that modified analysis failed to negate probable cause in this case, we hold that the trial court correctly determined that Gonzales's rights under the Fourth Amendment were not violated. As Gonzales's rights under the Fourth Amendment were not violated by the search warrant authorizing the blood draw in this case, we affirm the judgment of the trial court.

Karen Angelini, Justice

PUBLISH