

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-22-00071-CR

Eric Daniel **AULD**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 198th Judicial District Court, Kerr County, Texas
Trial Court No. B16861
Honorable Rex Emerson, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
               Irene Rios, Justice
               Lori I. Valenzuela, Justice

Delivered and Filed: March 15, 2023

AFFIRMED

A jury found appellant, Eric Daniel Auld, guilty of the murder of Magan Nicole King, and the trial court assessed punishment at ninety years' confinement. In three issues on appeal, Auld challenges the trial court's denial of his pretrial motions to suppress. We affirm.

## RELEVANT BACKGROUND

On November 3, 2016, Kerr County Sheriff's Deputy Emilio Vasquez was dispatched to the Auld Ranch to perform a welfare check after Magan's mother reported her missing. Magan's mother knew that her daughter and her daughter's friend, Brandi Desrosiers, had gone to the ranch.

While at the ranch, Vasquez spoke to Auld and Steven Jilek. Auld lived and worked on the ranch. Auld told Vasquez that Magan and Brandi were at the ranch, but Magan had returned to San Antonio. Also on November 3rd, Brandi called the Kerr County Sheriff's Office to report information she had about Magan. Kerrville Sheriff's Office Investigator James Ledford and Captain Carol Twiss traveled to San Antonio to interview Brandi. Based on information gathered from this interview, Ledford wrote affidavits in support of his request for warrants to conduct searches at the Auld Ranch.

At issue in this appeal are two warrants. The so-called "Physical Evidence Warrant," sought "evidence of the crime of Murder to include," among other items: human corpses, blood, hair, bodily fluids, photos, and clothing. The physical evidence collected and photographs taken pursuant to this warrant comprised most of the evidence admitted at trial. The so-called "Burn Pit" warrant sought "evidence of the crime of Murder to include:" a burn pile where a cell phone and purse belonging to Magan was burned and bullet fragments from the location where Magan was shot and/or the location where Magan's body was recovered. Auld's motions to suppress the warrants were denied following a hearing held over two days, September 30, 2020, and January 20, 2021.

In his first issue on appeal, Auld asserts the trial court erred by denying his motion to suppress because the search warrants were issued based on affidavits containing material omissions concerning the credibility of Ledford's source (Brandi). In his second and third issues on appeal, Auld contends the trial court erred in determining he lacked standing to challenge the search of the "burn pit."

## THE PHYSICAL EVIDENCE WARRANT

Auld asserts the trial court erred by denying his motion to suppress the Physical Evidence Warrant because the warrant was issued based on an affidavit that contained material omissions.

**A. Standard of Review**

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189-90 (Tex. Crim. App. 2018). "At a motion to suppress hearing, the trial judge is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony." *Id.* at 190. Therefore, we afford almost complete deference to the trial court in determining historical facts; however, we review de novo whether the facts are sufficient to give rise to reasonable suspicion in a case. *Id.* When, as here, a trial court makes express findings of fact, we must examine the record in the light most favorable to the ruling and uphold those fact findings so long as they are supported by the record. *Tilghman v. State*, 624 S.W.3d 801, 806 (Tex. Crim. App. 2021). We then apply a de novo standard of review to determine the legal significance of those facts. *Id.*

The issuance of a search warrant depends upon the existence of probable cause. *Diaz v. State*, 632 S.W.3d 889, 892 (Tex. Crim. App. 2021). "Probable cause exists if there is a fair probability that evidence of a crime will be found at a specified location." *Id.* "The test is whether a reasonable reading of the supporting affidavit provides a substantial basis for the magistrate's conclusion that probable cause existed." *Id.* "In determining whether probable cause exists to support the issuance of a search warrant, the magistrate to whom the probable cause affidavit is presented is confined to considering the four corners of the search warrant affidavit, as well as to logical inferences the magistrate might draw based on the facts contained in the affidavit." *Hyland v. State*, 574 S.W.3d 904, 910-11 (Tex. Crim. App. 2019). Generally, a reviewing court applies a presumption of validity regarding a magistrate's determination that a search warrant affidavit supports a finding of probable cause. *Id.* at 911.

"But the presumption of validity regarding the magistrate's probable cause determination may be overcome if the defendant can show the presence of false statements in the search warrant

affidavit that were either made deliberately or with reckless disregard for truth." *Id.* A criminal defendant may challenge the truthfulness of factual statements made in a search warrant affidavit. *Diaz*, 632 S.W.3d at 892 (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "When the defendant challenges the warrant affidavit on the ground that it contains known falsehoods, . . . the trial court is not limited to the 'four corners' of the affidavit." *Cates v. State*, 120 S.W.3d 352, 355 n.3 (Tex. Crim. App. 2003). "Limiting a falsity challenge to the four corners of the warrant affidavit negates the underlying challenge and raises serious due process concerns." *Id.*; *see also Franks*, 438 U.S. at 156 (stating that "if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request"); *State v. Verde*, 432 S.W.3d 475, 481 (Tex. App.—Texarkana 2014, pet. ref'd) ("[I]n a *Franks* hearing, the trial court may consider not only the probable cause affidavit, but also the evidence offered by the party moving to suppress because this attack on the sufficiency of the affidavit arises from claims that it contains false statements."). The defendant bears the burden to show by a preponderance of the evidence a material misstatement that was made intentionally or knowingly or with reckless disregard for the truth. *Diaz*, 632 S.W.3d at 892.

This appeal does not involve allegations that Ledford's affidavit contained misstatements or falsehoods, but instead omissions. Auld asserts Ledford was aware of facts seriously undermining Brandi's general credibility and her ability to perceive and process the events she described, but he failed to provide these facts to the magistrate. Auld argues these omissions were material and deprived the magistrate of a fair and informed evaluation of the information conveyed by Brandi.

The Texas Court of Criminal Appeals has assumed, but not yet decided, that *Franks* applies to material omissions. *See Diaz*, 632 S.W.3d at 892 ("We have assumed that *Franks* applies to material omissions, but we have not decided the issue."); *Renteria v. State*, 206 S.W.3d 689, 704

(Tex. Crim. App. 2006) ("In any event, assuming that *Franks* applies to omissions, the magistrate would have had probable cause to issue the warrant even with the inclusion of the information that appellant claims should have been included in the search-warrant affidavit."). However, in a 2015 opinion, this court held *Franks* applies "to challenges of material omissions contained in probable cause affidavits." *Gonzales v. State*, 481 S.W.3d 300, 311 (Tex. App.—San Antonio 2015, no pet.).

The *Gonzales* court held that, "[a]pplying the *Franks* analysis to material omissions requires varying the analysis somewhat." *Id.* The trial court must determine "whether the defendant proved by a preponderance of the evidence (1) the omissions were in fact made and (2) they were made intentionally or with a reckless disregard for the accuracy of the affidavit." *Id.* If the defendant carries this burden, the trial court must determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause. *Id.* If, after including the omitted material, the affidavit did not establish probable cause, then the search warrant would be voided and the fruits of the search excluded. *Id.* "Under those circumstances, we would no longer defer to the magistrate's initial probable cause determination." *Moffett v. State*, No. 04-19-00039-CR, 2019 WL 4178642, at *2 (Tex. App.—San Antonio Sept. 4, 2019, no pet.) (mem. op., not designated for publication). "Instead, the question on appeal 'becomes the same as it would be for the magistrate conducting an initial review of a search warrant affidavit.'" *Id.* (citation omitted). "Therefore, under those circumstances, we review the search warrant affidavit with the omitted material to determine whether the affidavit established probable cause under a totality-of-the circumstances approach." *Id.*

**B. Did Auld Prove Ledford Omitted Facts Knowingly and Intentionally, or With Reckless Disregard for the Truth?**

We first determine whether Ledford omitted facts from his affidavit and, if he did, whether he did so intentionally or with a reckless disregard for the accuracy of his affidavit. Auld asserts Ledford was aware of information that seriously undermined Brandi's general credibility and her ability to perceive and process the events she described, but he failed to provide these facts to the magistrate. Auld also contends Ledford failed to investigate Brandi's credibility, corroborate her story, or fully inform the magistrate.

**1. Ledford's Affidavit**

Ledford's affidavit stated the following as a basis for his belief that a murder had been committed and evidence of the murder was located at the Auld Ranch:

> Deputy Vasquez called Brandi and asked her if she had heard from or seen Magan, [Brandi] stated that she had not seen or heard from Magan since approximately 11:00 p.m. on October 30, 2016 when Brandi was going to sleep, she further stated that while she was going to sleep she had overheard Magan and Eric [Auld] arguing over some property that belonged to Magan. Brandi confirmed that Eric and Magan were dating.

> Kerr County Sheriff's Office Criminal Investigations Division Captain Carol Twiss spoke with Brandi via cell phone and asked her if she had heard from or seen Magan, she stated that she had not heard from or seen Magan since approximately 11:00 p.m. on Sunday, October 30, 2016 at Eric's residence. Brandi stated that when she woke the next morning Magan was nowhere In [sic] sight. Brandi stated that Magan was supposed to drive Brandi's 2008 Mitsubishi Eclipse from Eric's residence to Brandi's residence but never arrived. Captain Twiss asked Brandi where Magan would go if she left Eric's property and Brandi stated either Brandi's house or Megan's[1] mother's house where her kids are.

> Brandi told Captain Twiss that Eric took her keys and cell phone and refused to let her leave the ranch from 9:00 a.m. and 3:00 p.m. on Monday, October 31, 2016. Brandi advised Captain Twiss that Eric has video cameras and Wi-Fi connections on the property, but turned them off while he held her there against her will.

> Brandi also stated to Captain Twiss that Magan and Eric have been using methamphetamines.

---

[1] Magan's name is misspelled as "Megan" throughout the affidavit.

. . .

At approximately 2029 hours Brandi contacted Captain Twiss via text message and sent the following Message, "can you call me I don't care what he does to me I have to tell u what he made me swear to say nothing of she was my best friend. And he is a monster. He said if I said anything he'd make me look crazy or in the wrong and have me dealt with. Please. I love my friend dearly. I did not see her or what was done but what I saw said enough. He held my phone and belonging [sic]. And he was supposed to bring my horses to me but wants me to come get them I am to scared".

I made arrangements to interview Brandi at the San Antonio Police Department Substation located on Prue Road in San Antonio, Texas. During the meeting with Brandi she advised that in the early morning hours of October 31, 2016 she was at Eric Auld's residence located on Highway 39, Hunt Kerr County, Texas.

Brandi advised that Eric Auld was upset with Megan because Megan would not give him any Methamphetamine. Brandi advised that Eric and Megan argued and Eric continued to get agitated. Brandi advised that she and Megan were trying to get their property which was inside of Eric's residence and he refused to give it to them.

Brandi advised that she decided to have sex with Eric in order to get her property and she and Eric went inside of the house. Brandi stated that she and Eric engaged in sexual intercourse and Megan stayed outside with Stephen Jilek. Brandi advised during the time she was inside of the house with Eric[,] Megan and Stephen were arguing. Brandi advised that she and Eric finished having sex and she went to the bathroom to clean up. Brandi stated that Eric went outside and a few minutes later Stephen came inside of the house and told her she needed to stay inside.

Brandi stated that she stayed inside of the house for a few minutes then became concerned about Megan and went outside so she could see what was going on. Brandi stated that when she went outside she saw Eric coming down off the hill and he was driving a Gator or Polaris style vehicle. Brandi stated that Eric no longer had a shirt on and had blood and scratch marks in his chest and shoulder.

Brandi stated that she asked what happened to Megan and Eric said "what are we going to do about this". Brandi advised that she looked over by her car and observed a large pool of blood on the ground. Brandi stated the car was parked near the "Bunk House[.]" Stephen told Eric they needed to call EMS and Eric told him he had already moved Megan so it was too late. Brandi stated that she wanted to leave, but Eric had her cell phone and keys and would not give them back to her. Brandi stated that Eric now had the methamphetamine that Megan had and was actively using it.

Brandi indicated that Eric made Stephen help clean up the blood and that Eric and Stephen were in and out of the house numerous times until about 0900 hours. Brandi advised that Eric laid down with her and apologized for what happened, but did not elaborate on what he was apologizing for. Brandi stated that she had to make

Eric think that everything was okay so she was nice to him, made him food, and reassured him she would not tell. Brandi stated that Eric asked her numerous times if he had to worry about this. Brandi stated Eric eventually let her leave, but told her she would need to report her car stolen. Brandi stated that she had two cars on the property and drove off with one and left the other there which she described as a white with black top Mitsubishi Eclipse convertible, temporary registration [] vin number [].

Brandi stated that Eric made her send text messages to Megan's cell phone telling her to call her mother. Brandi stated that Eric also tried to get her to call and message Megan's cell phone to make it look like she was no longer on the ranch.

## 2. Omissions

During the hearing on Auld's motions to suppress, Ledford testified[2] and the trial court admitted into evidence the audio recording of the oral interview of Brandi. Ledford testified the Physical Evidence Warrant was primarily based on the information he received from Brandi. On appeal, Auld contends Brandi told Ledford certain things about herself, which Ledford omitted from his affidavits. During the hearing, Ledford admitted Brandi told him the following:

1. Brandi and Magan had used hallucinogenic mushrooms the night Magan died.
2. As a result of hallucinogenic drug use, Brandi and Magan were a "giggling mess" and "off in our own little world."
3. Brandi described herself as a "survivor" who "can be pretty [f***ing] convincing if I have to be."
4. Brandi earned her living as a "call girl."
5. Brandi suffered brain damage as the result of a cocaine overdose at the age of eighteen.
6. Brandi was a recovering heroin addict.

## 3. Ledford's Explanation for the Omissions

Ledford testified he had never met Brandi before the November 3rd interview and he did not know whether she was a credible and reliable person. He did not ask Brandi any follow-up questions about how her brain damage may have affected her ability to process or recall events and he did not review any medical records to determine if she fully recovered from the brain

---

[2] Twiss and Auld also testified. Auld testified for the limited purpose of establishing his standing to bring the motions to suppress.

damage because he believed she was able to recall enough events to assist in the investigation. He did not conduct a criminal background check on Brandi because he thought she was credible based on "what [they] were looking for." Regarding the omission of Brandi's "history of drug use, the drug use on that night, her state of mind, her criminal history, her occupation, the fact she had suffered from brain damage, and that she said she had fragmented memory," Ledford stated, "Correct. I'm not sure if I – I didn't include some of that, but I didn't leave it out on purpose." When asked if he was the person who made the decision not to include certain information in his affidavit, Ledford responded it was his decision, but "it never crossed [his] mind to put it in there in the first place."

When asked if he took independent steps to corroborate what Brandi told him, Ledford said he "didn't have anything else to corroborate it with. All I had was a missing person complaint. I had the deputies that were involved in going out to the ranch trying to make contact, and basically that's all we had." Although some of the information Brandi provided was information she received from Jilek and it was possible Jilek was an eyewitness to the events of the night the murder occurred, Ledford said he did not interview him before obtaining the search warrant. Ledford also did not contact several other people Brandi said she spoke to about what happened, and he agreed that had he done so he may have been able to determine whether the story Brandi told each person was consistent from one person to the next. Ledford explained that, at the time, although they did not know if Megan was dead, they believed she was dead because Brandi saw blood on Auld; they did not know the location of her body; and, if she was dead, they did not want the body to disappear. They were trying to act as quickly as possible and they believed they had enough information based on what Brandi told them because, although the investigation began as a missing person's case, after speaking to Brandi he believed it was "highly likely that it was going to be a murder." He replied "no" when asked if he had "much time to then go out and continue

doing a full investigation to corroborate and interview other witnesses and add to the investigation when time [was] of the essence."

Ledford explained the independent investigation during the approximately fourteen hours between speaking with Brandi and presenting his affidavit for a search warrant:

> I spoke with – I spoke with Sergeant Bowman, who was a patrol sergeant. I also spoke with Deputy Emilio Vasquez about what they had learned between – by talking to Magan's mother or her calling in to the sheriff's office wanting a welfare check and what the outcome were [sic] when the Deputy Vasquez went out to the ranch and met with Eric and looked around, then I reviewed a report that was written by Sergeant Callcott, patrol sergeant that detailed him and another deputy going out there also and trying to make contact with Eric during the night the night before.

He explained the almost fourteen-hour delay between the interview and submitting the affidavit and warrant to the magistrate as follows:

> [Time] was of the essence, and also it was – as you already stated, it was 10:00[p.m.], 10:30 by the time we got through with the interviews [in San Antonio], take another hour, hour and a half to get back to Kerrville. It was dark. With going out to a 3,000-acre ranch, it just would [not] have been safe and wouldn't have been practical, plus it would have taken – or it took probably four hours to put the affidavit together and get it signed, so we moved it – I can assure you we moved expeditiously on this.

Ledford conceded Brandi's statement to Deputy Vasquez—that Magan left the property—was inconsistent with what she told Ledford—that Megan disappeared. Ledford explained the inconsistency as Brandi, at the time, trying to protect herself because she was afraid of Auld and because Auld had threatened her and Jilek.

According to Ledford, Brandi was not an informant; she was merely a witness to a possible criminal episode. When he and Twiss interviewed her, she did not appear to be high, intoxicated, or incoherent. He said that "most of the time" she appeared able to "recall events well and perceive them well and give a good rendition of what she communicated." When she appeared not to perceive something well, he believed it was because of her memory and not because she was "crazy

or [had] brain damage issues." He did not perceive anything during the interview that made him question her sanity, which may have led him to obtain her medical records to determine if she was competent.

Ledford agreed that witnessing something "horrific" or being in fear for one's life may affect a witness's ability to recount the event. He said that if a witness is not immediately forthcoming, he will talk to them, try to get them to relax, and talk about their background in an attempt to get the witness to open up more. However, he did not believe doing so was relevant to what a judge should know to establish probable cause. His main focus when drafting an affidavit is to include what he learned both before and after any interview and he focuses on a "particular issue" as opposed to an entire narrative of a person's life. He does not transcribe an interview to include it in his affidavit.

During the almost hour-long interview with Brandi, Ledford believed her to be truthful and that she gave detailed facts to support what she told him. He believed Brandi was credible because she was the person who contacted Twiss, she was voluntarily providing them with information, and he and Twiss were not "there on a fishing expedition." The following questions then transpired:

> Q. . . . You know if she is involved in the commission of an offense, it's certainly in her best interest to come up with a good story and point the finger at someone else. That happens, right?
> A. I'm sure it does, but we were at the beginning of the investigation. You have to start somewhere and just work your way through it, figure out who was involved.
> Q. I can completely agree with you, and part of working your way through it is gathering additional information, verify whether or not this very first person to come to you has some credibility, right?
> A. I felt she did. She was very credible.
> Q. Based – what do you base that on?
> A. On her – she was terrified. She was shaking. She was crying during part of that interview. She provided good details, you know, on some of the stuff, so you can just – just the history that she provided of what all went on at that ranch and what they were doing out there, everybody, what everybody was doing out there.

It wasn't so much she was trying to place blame on one individual. She was admitting that they were all doing drugs and, you know, I just felt she was being credible.

He stated he did not knowingly or recklessly make any false statements, nor did he knowingly or recklessly omit information to deceive the magistrate.

### 4. Analysis

Based on the record from the motion to suppress hearing, Auld established Ledford omitted certain facts from his affidavit. Therefore, we next determine whether the omissions were made with a reckless disregard for the truth.[3]

Although Auld challenges Brandi's credibility, "the credibility at issue in the suppression hearing belonged primarily to Investigator [Ledford] as the author of the affidavit in question." *Megwa v. State*, 633 S.W.3d 653, 666 (Tex. App.—Fort Worth 2021, pet. ref'd);[4] *see also Murray v. State*, 534 S.W.3d 540, 543 (Tex. App.—San Antonio 2017, no pet) ("The reliability of the affiant and his sources of information are part of the totality of the circumstances that the magistrate should evaluate in making a probable-cause determination.").

The trial court considered Ledford's credibility during his testimony and, in its Conclusions of Law, determined the omissions were not "omitted with a conscious disregard for the truth or with the intent to deceive the magistrate to whom the search warrant was to be presented." "We may not second guess that credibility determination." *Megwa*, 633 S.W.3d at 666. After examining the record in the light most favorable to the ruling, we uphold the trial court's conclusion because it is supported by the record. *See Tilghman*, 624 S.W.3d at 806; *see also*

---

[3] On appeal, Auld does not assert Ledford acted with intent to deceive.

[4] In *Megwa*, appellant argued "that Investigator Fleming relied on Broadnax's credibility in attempting to establish probable cause for the search and thereby demonstrated a reckless disregard for the truth when she failed to disclose that Broadnax was being rewarded for her cooperation through dismissal of her traffic violation and by not being charged with possession of a controlled substance without a prescription; that Broadnax 'suffered from numerous mental illnesses including drug addiction[,] severe depression[,] and schizophrenia'; and that Investigator Fleming 'had no prior experience with Broadnax as an informant by which to determine her reliability.'" 633 S.W.3d at 666.

*Gonzales*, 481 S.W.3d at 312 ("As the officer coordinating the oral reports from all the other officers, his omission could have reasonably been attributed to mere negligence. Therefore, the trial court did not err in determining Gonzales failed to show that Officer Magee made the omission intentionally or with disregard to the truth.").

**B.      Conclusion**

Because application of the modified *Franks* analysis failed to negate probable cause in this case, we hold the trial court correctly determined the magistrate had a substantial basis for determining probable cause existed.

## STANDING TO CHALLENGE THE BURN PIT WARRANT

At the suppression hearing, the State argued Auld lacked standing under the open fields doctrine to contest the search of a burn pit that contained fragments of Magan's remains. The trial court sustained the objection. In two issues, Auld challenges the trial court's ruling under both the Fourth Amendment to the United States Constitution and Article 1, section 9 of the Texas Constitution.

**A.      Relevant Background**

Auld testified he has lived on the 5,600-acre Auld Ranch for the past thirty-eight years, since he was two years old. His house, which he shares with his grandmother, has four bedrooms and four and one-half bathrooms. He keeps personal property in his home and his vehicles on the property. He has access to the buildings on the property. Auld also works on the ranch where he manages the hunting operations and performs other maintenance work. He has the authority to allow people to enter the ranch and the authority to exclude people from the ranch. However, other people have the same authority. In addition to his house, the ranch also has a lodge, the foreman's house, and other buildings. The ranch is run as a family partnership, of which Auld is a partner.

All partners have access to the ranch and know the combination to the entry gate. Hunters have a lease on the property that includes access to the lodge.

## B.     Standard of Review

The right to challenge the lawfulness of a search is limited to persons with standing—that is, to those who have a reasonable expectation of privacy in the area searched. *See Goehing v. State*, 627 S.W.2d 159, 164 (Tex. Crim. App. [Panel Op.] 1982) ("It was therefore incumbent upon appellant to show that he had some proprietary or possessory interest in the Jarvis Ranch property, that was invaded by the law enforcement officers, in order for him to legally complain of any search and seizure by law enforcement officers."). The defendant has the burden to establish standing to object to a search. *State v. Klima*, 934 S.W.2d 109, 110 (Tex. Crim. App. 1996). We review standing de novo, as it is a question of law. *State v. Johnson*, 896 S.W.2d 277, 285 (Tex. App.—Houston [1st Dist.] 1995), *aff'd*, 939 S.W.2d 586 (Tex. Crim. App. 1996).

## C.     Open Fields Doctrine

The Fourth Amendment to the United States Constitution and article I, section 9 of the Texas Constitution protect against unreasonable searches and seizures. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. The protection hinges on whether a person has an objectively reasonable expectation of privacy in the thing or place subject to search. *Oliver v. United States*, 466 U.S. 170, 177 (1984). A person has a reasonable expectation of privacy not only in his home, but also in the curtilage of his home. *Id.* at 180; *Cooksey v. State*, 350 S.W.3d 177, 183 (Tex. App.—San Antonio 2011, no pet.). "Curtilage" is defined as "the area around the home to which the activity of home life extends." *Oliver*, 466 U.S. at 182 n.12.

On the other hand, the "open fields" doctrine allows law enforcement to enter and search an area of land without a warrant. *Rosalez v. State*, 875 S.W.2d 705, 713 (Tex. App.—Dallas 1993, pet. ref'd). The term "open field" may be defined as any unoccupied or undeveloped area

outside the curtilage of a dwelling. *Oliver*, 466 U.S. at 180 n.11; *see also Davidson v. State*, 249 S.W.3d 709, 727 (Tex. App.—Austin 2008, pet. ref'd) ("The evidence at the hearing showed that the rural ranch property in question falls squarely within the definition of 'open fields' in which appellant is not entitled to an expectation of privacy. That the property was fenced and gated does not create an expectation of privacy that society recognizes as legitimate and reasonable."). An "open field" need not be "open" or a "field" as those terms are commonly understood. *Oliver*, 466 U.S. at 182 n.11. "[A] thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." *Id.*

In this case, Auld concedes the burn pit was located outside the curtilage of any of the structures on the ranch. On appeal, he correctly states the open fields doctrine but he urges this court to reconsider and vacate that doctrine because it is, according to Auld, outmoded and inconsistent with developed Fourth Amendment privacy law focusing on a person's reasonable expectation of privacy. Auld concedes this court lacks the authority to contradict the United States Supreme Court's interpretation of the Fourth Amendment. Nevertheless, Auld contends, without further explanation, that he had a reasonable expectation that the Auld Ranch would not be subject to itinerants, casual trespassers, or government intruders. Therefore, he concludes, he has standing.

We decline Auld's invitation to reconsider the open fields doctrine because to do so would require that we overrule the Court of Criminal Appeals' application of the doctrine—a prerogative we do not enjoy. *See Goehing*, 627 S.W.2d at 162 ("However, we do not find under the above facts that the above aerial observation of the marihuana plants falls within a protected area of the Fourth Amendment, but in fact find the observation of the marihuana plants was without any protected area and actually falls within the confines of the open fields doctrine."); *see also State v. Story*, 445 S.W.3d 729, 735 (Tex. Crim. App. 2014) (Keller, J., dissenting) ("But even if the State needed the 'open fields' doctrine, that doctrine has been construed to be part of the expectation-

of-privacy inquiry upon which the defendant has the burden of proof. Contrary to the Court's position, the State had no burden to show that the deputies were not trespassers or that the field in question was an open field.").

**D.    Texas Constitution**

Auld also asserts the trial court erred in determining he lacks standing because the Texas Constitution provides broader protections and a more expansive review in challenges to search warrants than that provided under the Fourth Amendment.

The Fourth Amendment provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

Article 1, section 9 of the Texas Constitution provides as follows:

> The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search *any place*, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

TEX. CONST. art. I, § 9 (emphasis added).

Auld argues the Texas Constitution's inclusion of the phrase "any place" confers a broader scope of review of the probable cause supporting issue.

The protections afforded by the state constitution may be lesser, greater, or the same as those of the federal constitution. *Hulit v. State*, 982 S.W.2d 431, 437 (Tex. Crim. App. 1998). "[T]he government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the Fourth Amendment or Article I, Section 9." *Davidson v. State*, 249 S.W.3d 709, 726 (Tex. App.—Austin 2008, pet. ref'd). We again decline Auld's invitation and we join our

sister courts in holding that "[t]he Fourth Amendment and Article I, Section 9 accord special protection to people in their persons, houses, papers, and effects, but that protection does not extend to 'open fields.'" *Id.* at 726; *Westfall v. State*, 10 S.W.3d 85, 89 (Tex. App.—Waco 1999, no pet.) ("The protections of the Fourth Amendment and article I, section 9 do not extend to 'open fields.'"); *White v. State*, 890 S.W.2d 131, 134 (Tex. App.—Texarkana 1994, pet. ref'd) ("We conclude that White had no expectation of privacy in the vacant lot because the vacant lot was not part of his residence or its curtilage. The State did not deny White his rights under the Fourth Amendment or Article I, Section 9 of the Texas Constitution."); *Beasley v. State*, 683 S.W.2d 132, 135 (Tex. App.—Eastland 1984, pet. ref'd) ("We hold that the language in Article 1, Section 9 of the Texas Constitution is substantially similar to, and not more restrictive than, the language of the Fourth Amendment of the United States Constitution. Therefore, the Texas Constitution does not prohibit the application of the 'open field doctrine'[.]").

## CONCLUSION

We overrule Auld's issues on appeal and affirm the trial court's denial of Auld's motions to suppress.

Lori I. Valenzuela, Justice

PUBLISH