# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-25-00343-CR
NO. 03-25-00344-CR
NO. 03-25-00345-CR
NO. 03-25-00346-CR
NO. 03-25-00347-CR

---

**Mario Villarreal, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 277TH DISTRICT COURT OF WILLIAMSON COUNTY
NOS. 24-1140-K277, 24-1139-K277, 20-1510-K277, 20-1507-K277, & 20-1509-K277
THE HONORABLE RICK J. KENNON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Mario Villarreal was charged with five counts of possessing child pornography. *See* Tex. Penal Code § 43.26. At the conclusion of the guilt-innocence phase, the jury found him guilty on all five counts. He elected to have the jury impose his sentence, and the jury assessed his punishment at six years' imprisonment for each count. *See id.* § 12.34. The trial court rendered its judgments of conviction consistent with the jury's verdicts. In three issues on appeal, Villareal asserts that the trial court erred by denying two of his motions to suppress and by failing to formally sentence him. We will affirm the trial court's judgments of conviction.

## BACKGROUND

In 2019, the Knoxville [Tennessee] Police Department and Homeland Security Special Agents were investigating whether Kelly Jones Stemeye committed the offense of possessing child pornography. On December 17, 2019, the investigating officers executed a search warrant for Stemeye's home and her electronic devices. The officers also interviewed Stemeye during the warrant execution.

In the interview, Stemeye admitted to possessing child pornography and "operating an online/phone sex business." Stemeye told the officers that she had several clients who were interested in child pornography, including "Marco," who "contacted her frequently" and had "sent her child pornography within the past 5 years." She related that they had "been communicating for several years," that they met on the website Latejade.com,[1] that she used the alias "Rachel Waters" on the platform, and that "Marco went by the username 'marcolizaldi.'" She also stated that she gave Marco her cell phone number and that they communicated through multiple platforms, including Skype, Signal, and Chattapp. Concerning child pornography, she explained that she and Marco would refer to it as "candy" during their conversations. She related that Marco would send her child pornography while asking her to watch him masturbate. Marco also discussed a fantasy in which the two of them would molest the three-year-old daughter of a friend of his, sent her "five . . . photos of a prepubescent female['s] genitals," and claimed the photos were of his friend's daughter.

As part of their investigation, the officers conducted forensic searches of Stemeye's electronic devices and discovered contact information for an individual named Marco.

---

[1] Because various websites and apps were used in this case to avoid detection by law enforcement, we will refer to the websites and apps by pseudonyms.

Further, the search revealed that Marco would pay Stemeye through the Money App on his phone before talking. One $100 transaction was sent from user "M Lizaldi" to "Rachel Waters" on March 25, 2017. When searching Stemeye's home, the officers discovered a thumb drive containing many images of child pornography in a file labeled "Marco."

The search of Stemeye's phone also revealed conversations between Stemeye and Marco in which they discussed child pornography. One conversation confirmed Stemeye's claim in the interview about Marco's wanting to molest the child of one of his friends and sending her photos of a nude young girl's genitals. In another exchange, Marco discussed "performing a 'pacifier trick' on a toddler," "penetrating the toddler's sex organ," and noticing the "funny faces" made by the children when penetration occurs. In a folder with Marco's name in the title as well as the phrase "paci!," the police found an image of an adult man "penetrating the sex organ of a female toddler." In another conversation, Marco stated that he wanted "to 'play'" and sent a code to Stemeye to access a video he described as "daring and sensual." A thirty-minute video was found on the phone with the same date as this exchange in which a nude adult woman massaged a prepubescent female child while an adult man "is seen in the video penetrating the child's sex organs."

The officers obtained an administrative subpoena for the account information for "marcolizaldi" from Latejade. The information provided by Latejade identified the registered Internet Protocol ("IP") address for the account. The information also specified that the name on the credit card used to pay for the account was Villarreal's and that the billing address for the card was a home in Round Rock, Texas. The officers discovered that the IP address belonged to Treaty Communications and sent an administrative subpoena to the company for the IP customer's information. The return listed Villarreal as the customer and provided a phone

number for him. The address listed in the return was the same Round Rock address from the Latejade account.

The officers discovered that Marco's phone number belonged to an electronic service provider named Chime, Inc. and submitted an administrative subpoena for the account information for the phone number. The return showed that the registered name for the number was Villarreal, that the address listed was the same Round Rock address listed in the other return, and that the phone number used to set up the account before receiving the additional phone number from Chime was the phone number listed in Villarreal's Treaty Communications account. The officers also sent an administrative subpoena to the operator of Money App for the account information for "M Lizaldi" and "Rachel Waters." The return showed that the "M Lizaldi" account belonged to Villarreal and that the phone number associated with the account was the same as the one affiliated with Villarreal's Treaty Communications account. The return for "Rachel Waters" listed Stemeye as the account owner.

In the investigation, the officers determined that Villarreal was "Marco" and lived in Round Rock. Following that discovery, Villarreal was stopped at a Customs and Border Protection checkpoint in Laredo, Texas, while re-entering the United States on July 21, 2020. At the border, Villarreal consented to having his iPhone searched. The agents discovered several Money App transactions "where Villarreal had paid . . . 'Rachel Waters' anywhere from $50-100 . . . for 'Candy.'"

Approximately one month later, the investigating officers contacted the Texas Attorney General's Office and talked with Officer Adam Madore. The officers relayed the results of their investigation concerning Stemeye and how it had led to the discovery of Villarreal's involvement. The officers continued their investigation concerning Stemeye and met

4

with her again in September 2020. During the second interview, Stemeye confirmed that she talked with Marco "over several years, until 2019"; communicated with him through text messages, chat apps, and chatrooms; and exchanged child pornography with him. She recalled that Marco "was interested in very young children[] that were toddlers." Further, she explained "that she found out [he] was sexually assaulting children around the March-May 2019 timeframe." Specifically, she remembered that he called her on Skype while he was watching his sister's young children, that he placed one of the children on the couch, that he removed the child's diaper, that he touched the child's genitals, that he placed his penis on the child's genitals, and that he licked the child's anus. Afterward, he went to another room and masturbated. Following the interview, the officers updated Officer Madore on what they had learned.

Around the time of the second interview, Officer Madore sought assistance from an analyst, who was able to confirm through a driver's license search and through utility bill records that Villarreal lived at the Round Rock address listed in the Treaty Communications account information. After confirming Villarreal's address, Officer Madore drafted a search warrant affidavit on September 14, 2020, seeking a warrant to search Villarreal's Round Rock home and electronic devices inside the home for evidence of child pornography. The affidavit included the information set out above.

Beyond the information above, Officer Madore specified in the affidavit that he had been assigned to the Child Exploitation Unit/Internet Crimes Against Children Task Force and had received specialized training by federal and state agencies concerning child abuse and internet investigations. Additionally, he described characteristics that generally exist regarding "people with a sexual interest in children[;] people who buy, produce, trade, or sell child

5

pornography[;] and people who molest children." Specifically, he stated that these groups of people "often collect sexually explicit material consisting of photographs, magazines, motion pictures, videotapes, books, diskettes, and slides depicting children, which they use for their sexual gratification and fantasy"; "rarely, if ever, dispose of their sexually explicit materials"; "use . . . photos . . . as a means of reliving fantasies or actual encounters with the depicted children"; maintain photos of the children they have abused, including potentially nude photos; and "utilize the photos as keepsakes and as a means of gaining acceptance, status, trust, and psychological support by exchanging, trading or selling them to other people with similar interests." Moreover, he related that he has learned that the internet has provided "persons who have a sexual interest in children with a virtually anonymous venue in which they can meet other people with the same sexual interests they have" and that those individuals store images on "computer[s] or external storage devices" to be "viewed on [a] computer monitor anytime the subject chooses" and "have many screen names and frequently change screen names to help cover their tracks and avoid leaving a trail of identity over time." More generally, he explained "that persons who use personal computers in their homes tend to retain their personal files and data for extended periods of time even if a person has replaced, traded in or 'upgraded' to a new personal computer" and that this is as likely "if not more so" for child pornography. Further, he wrote that child pornography is more likely to be found at a defendant's home because privacy is needed to enjoy the images for sexual gratification. Regarding the stored data, he explained that images can be stored "for an indefinite period of time, including weeks, months, and years," and that forensic examinations of electronic documents can recover deleted files.

The trial court signed the search warrant on September 14, 2020, and a search was conducted two days later. The police seized multiple electronic devices from the home.

6

Subsequent forensic searches of the devices resulted in the discovery of, among other things, the five images serving as the bases for the charges at issue in these cases: three photographs depicting a penis penetrating or touching a child's vagina, a video recording a penis penetrating a child's anus, and a photograph showing a penis penetrating or touching a child's mouth. Villarreal was arrested and charged with five counts of possessing child pornography.

Before trial, Villarreal filed two motions to suppress relevant to these appeals. The first asserted that the evidence obtained during the search should be suppressed because the search warrant affidavit contained false and materially incomplete information. The second motion asserted that the evidence should be suppressed because the affidavit contained stale information. After the motions were filed, the trial court held a hearing to consider them.

During the hearing, officers involved in the investigations into Stemeye and Villarreal testified. In addition, the trial court admitted, among others, the following exhibits: the records and transaction history for Villarreal's account on Latejade, the customer information for Villarreal's Treaty Communications account, the customer information for his Chime account, the communication history from a chat group with the name "rachelscandy" on the Talkdance app, text exchanges from 2019 between Villarreal's phone and a contact named Rachel, the search warrant for Stemeye's house, a recording of and transcript from Stemeye's first interview with the police, photos of items collected during the border stop, photos of payment activity to Rachel Waters's account, Ring camera footage from Villarreal's home when the police executed the search warrant, and a recording of and transcript from Villarreal's interview with the police.

First, Agent John Condon from Homeland Security Investigations ("HSI") testified about the search that occurred at the border on July 21, 2020. Regarding his involvement, he explained that he received a call from Customs and Border Protection in Laredo,

Texas. The caller advised Agent Condon that Villarreal was entering the country from Mexico and had been flagged in the system as a person requiring a second inspection because he might be in possession of child pornography. Agent Condon then spoke with an HSI agent from Knoxville who discussed the investigation in Knoxville, mentioned how the name Rachel Waters was part of that investigation, and asked Agent Condon to look for transactions involving Waters on Villarreal's devices. When Agent Condon arrived at the entry port, customs agents had already gathered Villarreal's electronic devices, including an iPhone and an iPad.

Agent Condon testified that people entering the country are subject to being searched and that their electronic devices may be searched. Further, he explained that he did a manual search of the iPhone in which he used his hand to search through the photos folder and communications apps without connecting the phone to another device to aid in the search. He explained that this type of search would not reveal deleted items or thumbnails. He related that he thought he also searched an iPad and that if he did, the search was shorter than the search of the iPhone. In his search, he noticed there were several Money App transactions from 2017 and 2018 through which Villarreal paid Waters $50 or $100. Some of the transactions specified that the money was "for candy" or used a lollipop and wink emojis. Agent Condon took photos of the search and prepared a report. He did not find any child pornography during the manual search and returned the items to Villarreal who was allowed to enter the country.

Next, Officer Madore testified that he worked for the Texas Attorney General's Office, was the assigned agent in these cases, and prepared the search warrant affidavit. Officer Madore related that on August 10, 2020, he was contacted by an officer from the Knoxville Police Department who explained that an investigation concerning Stemeye led to evidence indicating that Villarreal possessed child pornography. Although Officer Madore knew that the

8

officers involved in the Knoxville investigation interviewed Stemeye multiple times and although he asked the officers to send any helpful information, he did not have access to any recording of the interviews before drafting the search warrant affidavit. Officer Madore admitted that he was unaware that Stemeye said in an interview that she had not talked to Villarreal for over a year. Officer Madore testified that he included in his report Money App transactions between Villarreal and Stemeye from 2017 but stated that he did not see in his report any discussion of transactions between them in 2018. He also recalled that he did not personally find evidence of transactions between them in 2019. However, he explained that the information he received from the Knoxville Police Department revealed that they had been communicating for several years through 2019.

Regarding the information provided to him, Officer Madore noted that he had been given the subpoena returns discussed in the affidavit and testified that Villareal's Latejade account was active in 2019. Officer Madore also received the communication history for a Talkdance app chatroom with chats titled "rachelscandy," "candyplay," "candystore," and "candyroom." Officer Madore explained that the two individuals in the chatroom discussed child pornography and "candy" and that the last communication occurred on December 4, 2019. Further, he related that the handle "curiousuncle" was used in the chatroom and that the email used for that handle was the same one Villarreal used in his Latejade account. In the communication history, the individuals discussed how it was "safer" to communicate through Talkdance than through other sources. In addition, one user proclaimed to be "[h]orny as fuck," and the other asked if the first user "[w]ant[ed] some candy you perv?" before sending files to the first user and using sexual terms to describe the sent images, including "six more of the little

candy being fucked by mommy." The files were sent over a period of months starting on July 14, 2018, and ending December 4, 2018.

Finally, Officer Shannon Morris testified that she worked for the Knoxville Police Department Internet Crimes Against Children Task Force. Further, she explained that as part of the investigation concerning Stemeye, she examined one of Stemeye's electronic devices and found text messages between Stemeye and "Marco." Officer Morris stated that the communications continued through May 2019. Although Officer Morris recalled that no child pornography was exchanged through text messages, she remembered that Stemeye and Marco discussed "candy" in their texts and discussed using other platforms like Talkdance to communicate.

At the conclusion of the hearing, Villarreal argued that his two suppression motions should be granted because the search warrant application contained false and materially incomplete information and because the information in the affidavit was stale. The State argued that the motions should be denied. After considering the parties' arguments, the trial court denied both motions without issuing any findings of fact or conclusions of law.

Following the trial court's rulings, the trial was held. Ultimately, the jury found Villarreal guilty in all five cases and assessed his punishment at six years' imprisonment in each case. Villarreal appeals the trial court's rulings on his motions to suppress.

**STANDARD OF REVIEW**

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and

10

the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). "Thus, the party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

In a suppression hearing, the trial judge is the sole trier of fact and judge of the witnesses' credibility and of the weight to give to their testimony. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018). Moreover, appellate courts apply "a bifurcated standard, giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see Arguellez*, 409 S.W.3d at 662 (explaining that appellate courts afford "almost complete deference . . . to [a trial court's] determination of historical facts, especially if those are based on an assessment of credibility and demeanor"). "When the trial court does not file findings of fact concerning its ruling on a motion to suppress, we assume that the court made implicit findings that support its ruling, provided that those implied findings are supported by the record." *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). "The appellate court then reviews the trial court's legal ruling *de novo* unless the supported-by-the-record implied fact findings are also dispositive of the legal ruling." *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006). In addition, a trial court's ruling on the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory, but "a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it." *Story*, 445 S.W.3d at 732.

11

**DISCUSSION**

In his first two issues, Villarreal contends that the trial court erred by failing to grant his two motions to suppress. Because the second issue asserts that the affidavit failed to establish probable cause as written, we will address that issue before addressing his first issue asserting that crucial information was omitted. In his final issue, he argues that the trial court erred by failing to orally pronounce his sentences.

**Motion to Suppress Asserting Affidavit Contained Stale Information**

In his second issue, Villarreal argues that the trial court erred by denying his second motion to suppress, which asserted that the information in the search warrant affidavit was stale by the time the warrant was obtained in September 2020. More specifically, he argues that "the information provided in the search warrant affidavit involved a passage of time that was more than months or even a year" and instead "addressed events that occurred several years earlier." He notes that the search of Stemeye's home and electronic devices occurred in December 2019 and asserts that the transactions and exchanges between Stemeye and Villarreal specifically mentioned in the affidavit—the "alleged criminal activity"—"centered around March of 2017, approximately 3 ½ years prior" to the preparation of the search warrant affidavit. Similarly, he argues that the Money App transactions discovered in the border search "were stale, occurring years prior to the search warrant affidavit" being prepared. Although Villarreal acknowledges that the affidavit mentioned how Stemeye admitted to exchanging child pornography with Villarreal, he emphasizes that the affidavit did not include any specific dates for those exchanges. Even though Villarreal notes that the affidavit did mention how Stemeye discussed in the second interview that she saw Villarreal sexually assault his sister's child

12

"around the March-May 2019 timeframe," he contends that this information was inconsistent with the information she provided in her first interview and that no evidence was offered to confirm that the abuse occurred.[2]  Finally, he argues that "there was no information provided in the search warrant affidavit to indicate something had occurred since the 2020 border search to justify a second search of [his] electronic devices."[3]

At the suppression hearing, Villarreal invoked the Fourth Amendment and Section 9 of Article I of the Texas Constitution, which "[b]oth . . . dictate that no search warrants may be issued without probable cause."  *See Kennedy v. State*, 338 S.W.3d 84, 91 (Tex. App.—Austin 2011, no pet.) (citing U.S. Const. amend. IV; Tex. Const. art. I, § 9).  Probable cause

[2]  In this issue, Villarreal also points to alleged omissions that he discusses in his first issue and asserts that those may have improperly clouded "any perceived issues of staleness." We will address those alleged omissions when discussing his first issue.

[3]  On appeal, Villarreal also seems to challenge what he characterizes as "boilerplate" statements in the affidavit concerning individuals who view and collect child pornography and commit sexual crimes against children, and he cites a federal case that found "rambling boilerplate recitations designed to meet all law enforcement needs" to be "foundationless." *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990).  To the extent that Villarreal is arguing that the information included in the affidavit can provide no assistance in determining probable cause under the analysis in *Weber*, we find his reliance on that case to be misplaced. Although the affidavit in *Weber* contained many statements like the ones included by Officer Madore, including that individuals who collect child pornography keep the material for long periods of time, *id.* at 1341, the court explained that for this type of "expert" "opinion to have any relevance, the affidavit must lay a foundation which shows that the person subject to the search is a member of the class" described by the "expert," that "the affidavit was not drafted with the facts of th[at] case or th[at] particular defendant in mind, and that "there was not a whit of evidence indicating that Weber was a 'child molester,'" *id.* at 1345.  We believe that the other information included in the affidavit in these cases provided a foundation from which the trial court could have reasonably concluded that Villarreal was someone who viewed and kept child pornography and abused children.  Moreover, as set out in the body of the opinion, our sister courts have relied on the type of information included by Officer Madore when determining that probable cause existed.  *See, e.g.*, *Bordelon v. State*, 673 S.W.3d 775, 791 (Tex. App.—Dallas 2023, no pet.); *Sanders v. State*, 191 S.W.3d 272, 279-80 (Tex. App.—Waco 2006, pet. ref'd). In any event, *Weber* is not binding precedent on this Court.  *Cf. Kihega v. State*, 392 S.W.3d 828, 833 (Tex. App.—Texarkana 2013, no pet.) (recognizing that "[f]ederal circuit court opinions . . . are not binding authority on Texas courts").

13

determinations under both constitutions apply the same standard. *See Dixon v. State*, 206 S.W.3d 613, 616 n.6 (Tex. Crim. App. 2006); *State v. Garrett*, 22 S.W.3d 650, 653 (Tex. App.—Austin 2000, no pet.). When reviewing a probable-cause determination, the reviewing court employs a "highly deferential standard," *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007), and should uphold a determination of probable cause provided that the magistrate had a "'substantial basis'" from which he could conclude "that a search would uncover evidence of wrongdoing," *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

"When determining whether probable cause exists to issue a search warrant, courts should be mindful of the proposition that there is a 'strong preference for searches conducted pursuant to a warrant' over searches conducted without a warrant." *Kennedy*, 338 S.W.3d at 91 (quoting *Gates*, 462 U.S. at 236). "Because of the preference to be given search warrants, a search incident to a warrant may be upheld in doubtful or marginal cases in which a search without a warrant would be unsustainable." *Id.*; *see also Gates*, 462 U.S. at 240 (explaining that preference for warrants is based on idea that it is better practice to allow neutral magistrate to review evidence rather than officers engaged in competitive field of crime fighting). Accordingly, "[s]earches justified by a valid warrant have a presumption of legality unless the opponent produces evidence rebutting the presumption of proper police conduct." *Pacheco v. State*, 347 S.W.3d 849, 855 (Tex. App.—Fort Worth 2011, no pet.).

"When determining whether probable cause exists, courts should consider the totality of the circumstances" and should rely on the facts found within the four corners of the accompanying affidavit. *Kennedy*, 338 S.W.3d at 91-92. Reviewing courts should not apply a "rigid application of the rules concerning warrants" and should instead "review technical

14

discrepancies" in the "issuance and execution of the warrant" "with a judicious eye"; "[t]o do otherwise would defeat the purpose behind the warrant requirement, and provide protection for those to whom the issue on appeal is not one based upon the substantive issue of probable cause but of technical default by the State." *Green v. State*, 799 S.W.2d 756, 757-58 (Tex. Crim. App. 1990). Moreover, when construing the language contained within affidavits and search warrants, courts "must do so in a common sense and realistic fashion and avoid hypertechnical analysis." *Faulkner v. State*, 537 S.W.2d 742, 744 (Tex. Crim. App. 1976). "As part of their probable-cause assessment, magistrates are permitted to make reasonable inferences from the information in the affidavit." *Kennedy*, 338 S.W.3d at 92. "Ultimately, the magistrate must determine whether 'given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Gates*, 462 U.S. at 238). To be proper, an accompanying affidavit must provide enough information to allow a magistrate to determine if probable cause exists and to ensure that the magistrate's determination is not "a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239; *see Franks v. Delaware*, 438 U.S. 154, 165 (1978) (explaining that affidavit "must set forth particular facts and circumstances underlying the existence of probable cause" that allow "magistrate to make an independent evaluation of the matter"); *Mayfield v. State*, 800 S.W.2d 932, 934 (Tex. App.—San Antonio 1990, no pet.) (explaining that affidavit must contain "sufficient information" to support probable-cause finding).

"[T]here must be sufficient facts within the affidavit to support a probable-cause finding that the evidence is still available and in the same location." *Crider v. State*, 352 S.W.3d 704, 707 (Tex. Crim. App. 2011). The "proper method to determine whether the facts supporting

15

a search warrant have become stale is to examine, in light of the type of criminal activity involved, the time elapsing between the occurrence of the events set out in the affidavit and the time the search warrant was issued." *McKissick v. State*, 209 S.W.3d 205, 214 (Tex. App.— Houston [1st Dist.] 2006, pet. ref'd). "The ultimate criteria in determining the evaporation of probable cause are not found in case law, but in reason and common sense." *Crider*, 352 S.W.3d at 707. The probability that the evidence sought to be obtained is still present and in the same place is a function of the following variables in the case:

> (1) the type of crime—short-term intoxication versus long-term criminal enterprise or conspiracy;

> (2) the suspect—"nomadic" traveler, "entrenched" resident, or established ongoing businessman;

> (3) the item to be seized—"perishable and easily transferred" (evanescent alcohol, a single marijuana cigarette) or of "enduring utility to its holder" (a bank vault filled with deeds, a "meth lab," or a graveyard corpse); and

> (4) the place to be searched—a "mere criminal forum of convenience or secure operational base."

*Id.* at 707-08 (quoting *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006)).

When the facts used to establish probable cause show only a single, nonrecurring crime occurring on a specific occasion, the key question is how long after that time evidence of that single crime can be expected to remain at the scene. *Id.* at 708. Evidence of ongoing or continuous criminal activity will generally defeat a claim of staleness. *Cuong Phu Le*, 463 S.W.3d at 876, 880. Courts have often held that child-pornography cases are continuous criminal endeavors that are more resistant to staleness arguments, particularly because

16

"collectors of child pornography tend to retain" the material. *See Ex parte Jones*, 473 S.W.3d 850, 857 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (collecting cases). In fact, courts have repeatedly rejected issues asserting that the passage of months or more than a year renders the information in an affidavit stale in child-pornography cases. *See Ahern v. State*, No. 03-14-00090-CR, 2016 WL 7046813, at *5 (Tex. App.—Austin Dec. 1, 2016, pet. ref'd) (mem. op., not designated for publication) (collecting cases).

Here, the affidavit suggested a long-term connection. More specifically, the affidavit linked Villarreal to a home in Round Rock and linked the online activity involving Stemeye to him, his home, his email, his credit card, and the IP address associated with his home. *Cf. Houlditch v. State*, No. 06-14-00207-CR, 2015 WL 6559175, at *3 (Tex. App.—Texarkana Oct. 30, 2015, no pet.) (mem. op., not designated for publication) (noting that affidavit related "that collectors of child pornography were likely to maintain their files for long periods of time in their homes"). From this information, the magistrate could have reasonably inferred that Villarreal was an "entrenched resident" and that the place to be searched was a secure operational base. *See Crider*, 352 S.W.3d at 708; *see also Bordelon v. State*, 673 S.W.3d 775, 791 (Tex. App.—Dallas 2023, no pet.) (relying on similar information when determining that character of suspect and premises did not weigh in favor of determination that information was stale); *Sanders v. State*, 191 S.W.3d 272, 279-80 (Tex. App.—Waco 2006, pet. ref'd) (referring to affiant's training and experience concerning child pornography collectors).

Regarding the nature of the crime and the items to be seized, Officer Madore explained that he had received specialized training in internet investigations and investigations involving child abuse and exploitation and that through his training he learned, among other things, the following: that people who have a sexual interest in children often collect sexually

17

explicit materials involving children, that they rarely dispose of these materials, that they use electronic media for sexual gratification, that the materials can be stored on computers or other similar devices, that the materials are retained even if the electronic devices they are stored on are upgraded, that the materials are most likely to be found on electronic devices at their homes due to the privacy needed to use the materials for sexual gratification, that a forensic examination can recover data that has been deleted from a computer or other storage device, and that the material can be stored on devices for years. *See Bordelon*, 673 S.W.3d at 791 (relying on similar information in affidavit when determining that nature of crime and items to be seized weighed in favor of determination that information in affidavit was not stale); *Ex parte Jones*, 473 S.W.3d at 857 (summarizing similar information when concluding that affidavit provided substantial basis to conclude that probable cause existed to search computer); *see also State v. Cotter*, 360 S.W.3d 647, 654 (Tex. App.—Amarillo 2012, no pet.) (noting that "a pornographic video transmitted over the internet via digital media[] is the type of item that is customarily . . . stored on a personal computer, and such property is often retrievable even after it had been purportedly erased from that computer").

Moreover, the affidavit specified that Stemeye admitted to possessing and trading child pornography with someone named Marco, that Villarreal was using the name Marco as an alias during his communications, that a large file of child pornography was found on a thumb drive recovered during a search of her residence, and that the name of the file included the name Marco. Further, Stemeye explained that Villarreal contacted her "frequently"; that they had been communicating "for several years"; that Villarreal would pay her for "candy," including one time in March 2017; and that Villarreal would masturbate while online with her when child pornography was exchanged. Additionally, the affidavit specified that the border search

18

confirmed the presence of cash transactions to Stemeye for "candy" on Villarreal's phone. In the affidavit, Officer Madore also stated that Stemeye mentioned how Villarreal had described his fantasy about the two of them molesting the three-year-old daughter of one of his friends, that he sent her photos purporting to be the genitals of the friend's child, and that she learned that Villarreal was sexually assaulting children "around the March-May 2019 timeframe." Concerning that incident of abuse, the affidavit mentioned how Stemeye personally observed Villarreal sexually abusing one of his sister's children during one of their communications over the internet before Villarreal began masturbating. Although nothing in the affidavit corroborated this particular act, the affidavit did establish that other portions of Stemeye's statements to the police were confirmed, including that they exchanged child pornography, that Villarreal paid for it, and that he sent images purporting to be photos of the genitals of a child of one of his friends. *See Eubanks v. State*, 326 S.W.3d 231, 248 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (noting that claims of sexual abuse can help establish probable cause to search for child pornography); *see also Ashcraft v. State*, 934 S.W.2d 727, 733-34 (Tex. App.—Corpus Christi-Edinburg 1996, pet. ref'd) ("An informant's declarations against the informant's own penal interest may be used to corroborate the reliability of information in an affidavit."). Officer Madore also explained in the affidavit that individuals who abuse children sexually may keep reminders of the abuse.

Both the affidavit and governing precedent "show that this was not a passing form of possession of a consumable contraband [that] may be over with a gulp or snort, but a more enduring form of possession." *Bordelon*, 673 S.W.3d at 792 (internal quotation and cite omitted). Accordingly, the trial court could have reasonably concluded that the information contained in the affidavit establishing probable cause had not become stale by the time that the

19

search warrant was obtained and, therefore, did not abuse its discretion by overruling Villarreal's second motion to suppress. *See Ex parte Jones*, 473 S.W.3d at 856 (determining that magistrate "could have reasonably concluded that the pornographic images were still on appellant's computer at his apartment at the time the warrant was issued" even though online purchases to obtain membership to child-pornography websites were made two to three years before affidavit was prepared); *Sanders*, 191 S.W.3d at 279-80 (noting that affidavit provided "substantial basis" to conclude that "probable cause existed that the computer . . . contained child pornography" in February 2003 where victim told officer that defendant had shown her child pornography on his computer in 2001); *see also Aguirre v. State*, 490 S.W.3d 102, 115 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (determining that affidavit supported conclusion that defendant would possess evidence of sexual abuse of child on computer even though last described incident of abuse occurred eighteen months before affidavit was prepared).

For these reasons, we overrule Villarreal's second issue on appeal.

**Motion to Suppress Alleging Affidavit Omitted Information**

In his first issue, Villarreal contends that the evidence obtained from the search of his home should have been suppressed because the search warrant affidavit failed to establish probable cause to search his home due to material omissions.

Under the United States Supreme Court's decision in *Franks*, a warrant must be voided and any evidence obtained pursuant to the warrant suppressed if (1) the defendant can establish by a preponderance of the evidence that the affidavit supporting the warrant contains a material misstatement that the affiant made knowingly, intentionally, or with reckless disregard for the truth; and (2) setting the false statement aside, the affidavit's remaining content is

20

insufficient to establish probable cause. 438 U.S. at 155-56; *Janecka v. State*, 937 S.W.2d 456, 462 (Tex. Crim. App. 1996); *see also Emack v. State*, 354 S.W.3d 828, 838 (Tex. App.—Austin 2011, no pet.) (noting that "it is the defendant's burden to prove the alleged perjury or reckless disregard for the truth by a preponderance of the evidence").

The Supreme Court explained in *Franks* that while the Fourth Amendment requires a truthful factual showing for determining probable cause, that requirement does not mean that each recited fact has to be precisely accurate, "for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." 438 U.S. at 164-65. Rather, "'truthful'" in this context means "that the information put forth [in the affidavit] is believed or appropriately accepted by the affiant as true." *Id.* at 165.

Although the Court of Criminal Appeals has assumed that *Franks* applied to material omissions, it has not expressly decided the issue. *See Diaz v. State*, 632 S.W.3d 889, 892 (Tex. Crim. App. 2021); *Emack*, 354 S.W.3d at 838; *see also Gonzales v. State*, 481 S.W.3d 300, 311 (Tex. App.—San Antonio 2015, no pet.) (deciding that *Franks* applies to material omissions in probable-cause affidavits). Assuming that it does apply, our sister court has explained how the analysis would apply to omissions: "a trial court would determine whether the defendant proved by a preponderance of the evidence (1) the omissions were in fact made and (2) they were made intentionally or with a reckless disregard for the accuracy of the affidavit." *Gonzales*, 481 S.W.3d at 311. "If the defendant carries this burden, the trial court would determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause for the defendant's arrest." *Id.* "If, after including the omitted

21

material, the affidavit did not establish probable cause, then the search warrant would be voided and the fruits of the search excluded." *Id.*

When presenting this issue on appeal, Villarreal refers to multiple alleged omissions that he asserts would have negated probable cause if they had been included in the search warrant affidavit. First, he notes that the affidavit only mentioned his iPhone being searched at the border and did not mention that his iPad was also searched. Although Agent Condon mentioned an iPad at the suppression hearing, he explained that he thought he searched the iPad too and that if he did, he spent less time searching it than he did the iPhone. Moreover, Officer Madore did not testify as to why the iPad search was not mentioned in the affidavit. For these reasons, the trial court could have reasonably determined that Villarreal failed to establish that the alleged omission was made intentionally, knowingly, or with a reckless disregard for the accuracy of the affidavit. *See id.*; *see also Auld v. State*, 673 S.W.3d 267, 275, 277-78 (Tex. App.—San Antonio 2023, pet. ref'd) (detailing officer's explanation for omissions, noting that credibility determination primarily belonged to author of affidavit, and concluding that appellate court could not second guess credibility determination); *Islas v. State*, 562 S.W.3d 191, 197 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (noting that defendant bears burden of establishing that statement was omitted intentionally, knowingly, or with reckless disregard for truth).

In addition to not testifying that the iPad was definitely searched, Agent Condon did not specify what the search of the iPad revealed or whether it differed from what was recovered from the iPhone. Accordingly, the trial court could have reasonably determined that including the iPad search would not have negated probable cause and that the omission was, therefore, not material. *See Gonzales*, 481 S.W.3d at 311.

Next, Villarreal highlights that the search warrant specified that the search of his iPhone showed Money App transactions in which Villarreal made multiple payments of $50 to $100 to Rachell Waters but did not specify when those transactions occurred. Further, he notes that Agent Condon testified at the hearing that the transactions occurred between June 2017 and July 2018, years before the search of Villarreal's home occurred. Considering the foregoing, Villarreal contends that including the dates of those transactions would have had an effect on whether probable cause existed to search his home and devices.

Although the referenced portion of the affidavit did not mention when those Money App transactions occurred, another portion specified that a Money App transaction between Stemeye and "Marco" occurred on March 25, 2017, for $100 like the transactions observed by Agent Condon. The trial court could have reasonably inferred that the March 25 transaction was one of the ones Agent Condon observed and that the others occurred around the same time. Moreover, Officer Madore did not testify regarding why the specific dates for the transactions were not included in the portion of the affidavit discussing the border search. Accordingly, the trial court could have reasonably concluded that Villarreal had not shown that an omission was made intentionally, knowingly, or with reckless disregard. *Cf. Dancy v. State*, 728 S.W.2d 772, 782-83 (Tex. Crim. App. 1987) (noting that officer was not asked whether statement was false and made intentionally or with reckless disregard before determining that defendant did not prove "that he was entitled to any relief under *Franks*").

Additionally, the affidavit did set out how Officer Madore learned from investigating officers in Knoxville that Stemeye confessed to possessing child pornography, that they found a large amount of child pornography on a drive found in Stemeye's home in a file associated with Villarreal, that she traded child pornography with Villarreal, and that she had

23

been communicating with him for years and continued to talk to him until 2019. Moreover, the affidavit specified that subpoena responses from the Knoxville investigation showed that Villarreal's credit card, home address, and phone number were listed under the handle on the communication services used by Stemeye to communicate with him. The affidavit also specified that Stemeye and Villarreal would refer to child pornography as "candy," as had been done in the Money App transactions found on his iPhone.

Accordingly, the affidavit recited facts indicating "activity of a protracted and continuous nature" over a several year period and through 2019, meaning that a lapse in time between the Money App transactions and the search was "less significant." *See Ryals v. State*, 470 S.W.3d 141, 146 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd); *see also Cuong Phu Le*, 463 S.W.3d at 880 (noting that "a cumulative" and "common-sense" view of affidavit can support probable-cause determination). Moreover, the affidavit included information from Officer Madore that individuals who collect child pornography are likely to keep it indefinitely and to treasure it. *See Barrett v. State*, 367 S.W.3d 919, 926 (Tex. App.—Amarillo 2012, no pet.) (concluding that magistrate had substantial basis to find that fair probability existed that images depicting child pornography would continue to be on or recoverable from computer device at residential address listed in search warrant). Based on the preceding, the trial court could have reasonably determined that including the dates of the Money App transactions would not have negated probable cause and that the omission was therefore not material.

Regarding the third alleged omission, Villarreal contends that the affidavit did not mention that no child pornography was discovered during the border search and refers to Agent Condon's testimony at the hearing in which he related that the only evidence obtained through the search was the transaction history from the Money App. Further, Villarreal contends that had

24

the omitted information been included, it would have dispelled probable cause to believe that another search of his electronic devices would result in the discovery of child pornography and that he was a collector of child pornography who would not destroy items previously gathered.

Although the affidavit did not specifically state that no child pornography was collected during the border search, the affidavit did specify when the searches of Stemeye's electronics resulted in the seizure of child pornography and did specify what information was obtained through the border search. In light of this specificity, the trial court could have reasonably inferred that Officer Madore would have mentioned child pornography being discovered in the border search if any had been found and reasonably read the affidavit as communicating that no child pornography had been discovered during the border search. *See Faulkner*, 537 S.W.2d at 744 (noting that affidavits must be read in common sense and realistic fashion); *Kennedy*, 338 S.W.3d at 92 (explaining that magistrates may make reasonable inferences from information in affidavit). Accordingly, the trial court could have reasonably determined that no omission—material or otherwise—was made concerning what was discovered during the border search. *See Heitman v. State*, 789 S.W.2d 607, 611 (Tex. App.—Dallas 1990, pet. ref'd) (emphasizing that defendant must "first" prove "that the omission was in fact made").

Concerning the alleged final omission, Villarreal asserts that although the transcript of Stemeye's interview from December 2019 in Knoxville showed that she told law-enforcement officials that she had not talked to Villarreal in a year, that she had not recently received any child pornography from Villarreal, and that she did not think he was abusing children, that information was not present in the search warrant affidavit. Villarreal contends

that the inclusion of this information would have affected whether there was probable cause to issue the warrant.

At the hearing, Officer Madore explained that although he asked the investigating officers to send him all the relevant information, he did not believe that the officers sent the recording of the interview in question and that he did not think he had reviewed the interview when preparing the affidavit. *See Gonzales*, 481 S.W.3d at 311 (noting that to obtain favorable ruling concerning alleged omission, defendant must show that omission was made intentionally or with reckless disregard to accuracy of affidavit). The trial court was tasked with determining the credibility of the testimony, *see Lerma*, 543 S.W.3d at 190, and could have reasonably found based on his testimony that he did not intentionally, knowingly, or recklessly omit from the affidavit the information above, *see Heitman*, 789 S.W.2d at 612 (explaining that although information about informant's criminal history was not included in affidavit, "the record contains no evidence" officer made omissions "intentionally or knowingly [or] with reckless disregard for the truth").

Moreover, the trial court could have reasonably determined that the inclusion of these statements from Stemeye would not have negated probable cause and that the omission was not material. Initially, we note that when deciding whether to issue the warrant, the trial court would have been tasked with deciding what weight to give the self-serving statements from Stemeye seeking to minimize her culpability. *Cf. Perales v. State*, 622 S.W.3d 575, 582 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (explaining that factfinder "was free to disregard appellant's self-serving testimony"). Additionally, Stemeye's claims in the interview were contradicted by other evidence at the hearing and other information in the affidavit establishing that she continued to communicate with Villarreal during 2019, that she sent images of child

26

pornography to him, and that she observed him sexually assault an infant on a day between March and May 2019.[4] Moreover, in light of the other language in the affidavit concerning how people who acquire child pornography also retain it for long periods of time, the trial court could have reasonably concluded that Stemeye's claim to not having provided more child pornography recently would not mean Villarreal did not still possess child pornography at his home. *See Barrett*, 367 S.W.3d at 926.

In light of the above, we conclude that the trial court could have reasonably determined that there were no omissions; that the alleged omissions were not intentionally, knowingly, or recklessly made; or that the alleged omissions would not have negated probable cause if they had been included. Accordingly, we conclude that the trial court did not abuse its discretion by denying Villarreal's first motion to suppress. *See Gonzales*, 481 S.W.3d at 312.

For these reasons, we overrule Villarreal's first issue on appeal.

---

[4] In his brief, Villarreal contends that the affidavit does not specify when the assault of the child occurred. However, we believe that a common sense and realistic reading of the affidavit would support a reasonable inference that the assault occurred sometime between March 2019 and May 2019. *See Faulkner v. State*, 537 S.W.2d 742, 744 (Tex. Crim. App. 1976); *Kennedy v. State*, 338 S.W.3d 84, 92 (Tex. App.—Austin 2011, no pet.). In the affidavit, Officer Madore documented how Stemeye stated that she did not find out that Villarreal was actually "sexually assaulting children" until "the March-May 2019 timeframe." Immediately after mentioning this timeframe, the affidavit related how Stemeye witnessed Villarreal sexually assaulting one of his sister's children. When reviewing the affidavit, the trial court could have reasonably inferred that the sexual assault occurred sometime between March and May 2019. *See Kennedy*, 338 S.W.3d at 92; *see also State v. Jordan*, 342 S.W.3d 565, 570 (Tex. Crim. App. 2011) (explaining that testing "two parts of the affidavit separately for probable cause runs afoul" of directive to review affidavit in light of totality of circumstances and explaining that specification of date in introduction "provided the magistrate with a substantial basis to infer" that crime was "observed on that same date").

**Oral Pronouncement of Sentence**

In his third issue, Villarreal contends that the trial court erred by failing to formally pronounce his sentences orally. Previously, this Court abated these appeals to allow the trial court to orally pronounce its sentences in Villarreal's presence. *See Villarreal v. State*, Nos. 03-25-00343—00347-CR, 2026 WL 1234905, at *2 (Tex. App.—Austin May 6, 2026, order) (mem. op., not designated for publication). Subsequently, the trial court held a hearing in which it pronounced its sentences in Villarreal's presence. After the supplemental clerk's and reporter's records pertaining to the hearing were filed in this Court, the cases were reinstated.

The relief Villarreal sought in his third issue has been granted by the trial court during the abatement, and there is, therefore, no longer a case or controversy between the parties regarding that issue. *See Neill v. State*, No. 05-23-00277-CR, 2024 WL 3715722, at *1 n.1 (Tex. App.—Dallas Aug. 8, 2024, no pet.) (mem. op., not designated for publication) (determining that appellate issue asserting that trial court erred by failing to announce his sentence was moot because sentence was announced in his presence during abatement); *Salinas v. State*, Nos. 05-13-01665—01666-CR, 2015 WL 4600734, at *5 (Tex. App.—Dallas July 31, 2015, no pet.) (mem. op., not designated for publication) (same).

Because that issue has been resolved, we overrule it as moot. *See Neill*, 2024 WL 3715722, at *1 n.1; *see also Lawrence v. State*, No. B14-87-00272-CR, 1988 WL 49796, at *1 (Tex. App.—Houston [14th Dist.] May 19, 1988, no pet.) (op., not designated for publication) (overruling one issue as moot before addressing remaining issue on appeal).

## CONCLUSION

Having overruled Villarreal's issues on appeal, we affirm the trial court's judgments of conviction.

_____

Karin Crump, Justice

Before Chief Justice Byrne, Justices Theofanis and Crump

Affirmed

Filed:   June 26, 2026

Do Not Publish